STATE v. GEORGE ARKLE.

*Indictment for Larceny—Larceny—Felonious Intent—*
*Failure to Return Property Found.*

1. To constitute larceny, there must be an original felonious intent, general or special, in the mind of the accused, at the time of the taking or finding lost property, otherwise it is a trespass only and not a felony.

2. The omission to use the ordinary means of discovering the owner of property lost and found raises a presumption of fraudulent intention against the finder, which it is necessary for him to explain and obviate and this is done by showing that he endeavored to find the owner or that he openly made known the finding so as to make himself responsible to the owner for the value when he should appear.

3. In a trial for larceny it appeared that defendant while away from home, received the property consisting of a pocket-book containing money, bank certificates, and a check payable to the prosecuting witness, from his wife, who found it, defendant not having been present when it was found. The day after he returned home, defendant wrote to the bank which issued the certificate for the name of the owner. There was some delay in returning the property, caused by a feeling engendered by correspondence with the owner, to whom defendant explained the whole matter, and by defendant's demand for a reward. *Held,* error to submit the case to the jury.

This was a CRIMINAL ACTION, tried at November Term, 1894, of COLUMBUS Superior Court, before *Brown, J.*

The defendant was indicted for larceny and receiving stolen goods, knowing them to have been stolen.

The jury found the defendant guilty upon the first count, his Honor having withdrawn the second count (receiving) from the consideration of the jury.

The following is the evidence for the State :

J. B. Harrelson testified :   On May 9, 1892, I started to Cerro Gordo on the W. C. & N. R. R. at night about 8

o'clock.    When I got on the train I had the pocket-book
with me.    This pocket-book contained two $1,000 certi-
ficates of deposit on Bank of New Hanover, payable to me
as Treasurer of Columbus County ; also one $500 certifi-
cate ; also $150 in money—I think that is the amount ; also
sight check for $230 on Bank of New Hanover, payable to
my order as treasurer, drawn by N. McPhaul, Sheriff.    I
am not positive the word treasurer was in the check ; also
receipt for $1,500 in the book and a railroad pass..    I had
the pocket-book in my pocket when I got on the train at
Whiteville.    I got off at Cerro Gordo, thirteen miles south
of here (Whiteville).    I got off the train at Cerro Gordo ;
and when I went into the room where my safe was, to
deposit the pocket-book in the safe, I then missed the
pocket-book.    The next morning I went to Wilmington
and notified the officers of the bank.    Sometime after that
I was informed by the bank that they had received a letter
inquiring if any of their depositors had lost anything of
value lately.

On June 13, 1892, I received a letter dated June 10,
1892, from George Arkle to myself.    Witness read the
letter as follows :

"WHEELING, WEST VIRGINIA, June 10, 1892.
*J. B. Harrelson, Esq., Cerro Gordo, N. C.*

DEAR SIR—Have you recently lost anything of value ?
If so, let me know what it was, where lost, and when, as I
may be able to give you some information in regard to the
same.                                    Respectfully,                    -
                                        GEORGE ARKLE."

To this letter I sent the following answer.    Witness read
this as follows :

STATE *v.* ARKLE.

"CERRO GORDO, N. C., June 13, 1892.

*Mr. George Arkle, Esq., Wheeling, West Virginia.*

DEAR SIR—Yours of the 10th inst. received and contents noted.   On the 9th of May last, at night, I lost a day-book, I thought and still think, on the train.   The book was black or dark, and near as thick as my thumb.   Have used it for a memorandum book for two or three years.   It contained a pass from John F. Divine, General Superintendent; a receipt from Powell & Co. for checks and cash, $1,500; a check on the Bank of New Hanover, Wilmington, N. C., given by N. McPhaul, Sheriff, for $230; one certificate of deposit on the Bank of New Hanover, Wilmington, N. C., dated December 29, 1891, No. 16,870, for $500; one certificate, dated December 29, 1891, No. 16,871, for $1,000; one certificate, dated May 6, 1892, No. 17,353, for $1,000.   These certificates were deposited in my name as treasurer.   These certificates were on deposit in the Bank of New Hanover, Wilmington, N. C.   Also, the book contained $150 currency.   I have had a great deal of trouble about this loss, and will be very, very glad of any news that may lead to the recovery of the papers with the money, or even for the papers, if the money cannot be got. Hope to hear from you by return mail.

Yours truly,<br>J. B. HARRELSON."

I then received from the defendant the following letter. Witness read this letter as follows:

"WHEELING, WEST VIRGINIA, June 21, 1892.

*J. B. Harrelson, Esq., Cerro Gordo, N. C.*

DEAR SIR—Yours of the 13th inst. to hand, and will say, on my arrival home, I wrote the Hanover Bank.   They answered that you wrote them that your certificate had

STATE v. ARKLE.

been stolen.  The facts are these : On  the night of May 9 my wife and me were on the train between Wilmington and Florence.  A man came on the train at a place between those places, and I noticed him throw himself down on the seat, and supposing him to be intoxicated I took no further notice of him until I passed through the car into the smoker, where I remained for some time.  Upon my return to the other car my wife informed me she had picked up a black memorandum book.  Upon examining it I discovered there was money and papers in it.  I examined it on my arrival at Charleston, intending to write from there, but neglected to do so until my return home.  The book contained the certificates, check, and receipt you described, and $140 in currency, instead of $150, as you recollect.  The reward should be, at least, $200, upon receipt of which I will send you the book and contents.

Respectfully,

GEORGE ARKLE."

I carried this letter to Col. A. M. Waddell, Wilmington, N. C., and he wrote to Mr. Arkle and in a short time I received the following letter.  Witness read the letter as follows :

"WHEELING, W. VA., July 7th, 1892.

J. B. Harrelson, Cerro Gordo, N. C.

DEAR SIR—I have received two letters from one A. M. Waddell, of Wilmington, who represents himself to be a lawyer, in which he threatens to indict me for trying to find out who the property belongs to, but as I have answered his letters it will not be necessary to say more on that subject at this time.  I have also told him as I now tell you, as I have been to a great deal of trouble in this matter, I shall institute a suit in attachment against you and have

the property seized to satisfy my claims. You may ask why on my return, I did not inquire about who you were and where you could be found at the Bank of Wilmington. The answer is, that I returned home by Cincinnati, Ohio, and I might further say that at Charleston I made inquiry about you from a member of the Supreme Lodge K. of H. Mr. M. L. Bellamy, of Wilmington, and could not tell what your address was. I invited him to examine the book and contents with me, which he agreed to do, but he left Charleston before doing so. In fact, I left the book in the safe at the Charleston Hotel when we left and I telegraphed them to send it to me at Cincinnati, which they did. Now, I am told you are a one-armed man, which I believe is correct. I always have a great deal of sympathy for any person who is a cripple, and had you stated your condition in your letter, in which you say to keep the money and send you all the papers, I should have done so. But now, as it has gone as far as it has, if you say you will pay the balance ($60) on receipt of the papers, I will send them C. O. D. by express to you.

　　　　　　　　　　　Respectfully,
　　　　　　　　　　　　　GEORGE ARKLE."

I got the three certificates, pass, the check from Col. Waddell. This was about October or November, 1892. I never got my money at all. I got everything back but the money. I missed the pocket-book after I got off the train at Cerro Gordo.

From Cerro Gordo to the South Carolina line is eight or ten miles. Fair Bluff is in this State, and the only station between Cerro Gordo and South Carolina. Florence is 51 miles from Cerro Gordo. This $140 was my money and county money mixed. I am sure part of it was

mine. I was not intoxicated that night. I do not remember seeing the defendant that night to know him. He did not come about my seat, that I remember.

A. M. Waddell testified: J. B. Harrelson advised with me. I wrote George Arkle as follows:

"WILMINGTON, N. C., June 24th, 1892.

*Mr. George Arkle,* 1314 *Market Street, Wheeling, W. Va.,*

DEAR SIR—Mr. J. B. Harrelson, who is one of my clients and friends, has brought me your two letters in regard to the money and property belonging to him in your possession, and has asked me to write you in regard to it. You will, upon receipt of this, please send by express to the Bank of New Hanover in this city or to me all of said property, upon receipt of which I will send you, not as a matter of right, but as purely a matter of courtesy, such a sum as Mr. Harrelson chooses to give you. It was your duty to have given the property to the conductor of the train, who knows Mr. Harrelson very well, and who would have at once returned it to him. You had no right to keep it, and after finding out to whom it belonged, both from the bank and Mr. Harrelson, it is a rather cool thing for you to continue to hold on to it and demand anything (much less $200) for returning it to its owner. The property has never been advertised and no reward has ever been offered for it, but Mr. Harrelson is willing to act as liberally according to his means in this and all matters as can be expected by a reasonable person. Your intimation that the person who sat in the seat where you say the property was found was intoxicated does not hurt Mr. Harrelson, as he never gets intoxicated, and I don't see how it would help you in keeping property, which you know belongs to him, even if he had been in that condition. I don't know that it would hasten your action to tell you that Mr. Harrelson is a one-armed

soldier, but such is the case.   Expecting to hear from you and to receive the property at once,

I am, yours respectfully,

A. M. WADDELL."

In reply to above letter, the defendant Arkle wrote:

"WHEELING, W. VA., June 28th, 1892.
*A. M. Waddell, Esq., Wilmington, N. C.*

DEAR SIR—Yours of the 24th to hand.   In reply will say to you, as I said to Mr. J. B. Harrelson, I think the sum of $200 will be about the right reward for the return of the book and contents, and as soon as the above amount is received, I will send the book and contents to him by express.

Respectfully,          GEORGE ARKLE."

Upon receipt of above letter I replied as follows:

"JUNE 30th, 1892.
*Mr. George Arkle, Wheeling, W. Va.,*

SIR—Your letter of the 28th inst. reached me to-day, and as you seem determined to let the law take its course in regard to your taking and carrying away Mr. Harrelson's property, I will accommodate you—but perhaps not in the way you expect.   If you think you can stand the consequences to yourself, it will suit Mr. Harrelson very well. He has put the whole matter in my hands, and I frankly tell you that unless you send the money and property at once, I will lay the matter before the grand jury and will get a requisition on the Governor of West Virginia for your person on a charge of larceny, when you will be given an opportunity to be heard publicly in regard to the matter. Mr. Harrelson's property disappeared in a car where you were, and you confess that you have it.   How you got it,

you may explain to a court and a jury.    Of course, I would rather not take this course, but it is better for Mr. Harrelson's money to go in this way than to remain in your pocket by his consent under such circumstances.    In conclusion, I will say that if you think this is a mere attempt to frighten you into a surrender of Mr. Harrelson's property you will make a great mistake.    Yours, &c.,

A. M. WADDELL."

In reply to this letter, I received the following:

"WHEELING, W. VA., July 7, 1892.
*A. M. Waddell, Wilmington, N. C.*

SIR—Yours of June 20th received and contents noted, and in reply will say that it comes with very bad grace from one who pretends to be a lawyer to make an accusation against me when you know at the time you make it you are uttering a falsehood.    You admit your client did not advertise his loss or make any effort to find his property, and you know if it had not been for my untiring efforts in trying to find the owner, you nor he would never have known what became of it, and yet you threaten me with indictment for trying to find the owner and requisition.    As I am personally acquainted with the Governor of this State, I don't think he will honor a requisition when the facts are placed before him, nor do I think a court or grand jury of citizens of your State could be found that would lend themselves to such an unwarranted and unlawful act.    As I have been to a great deal of trouble in this matter, I shall institute suit in attachment against your client and have the property seized to satisfy my claim.    GEORGE ARKLE."

To this letter I replied as follows:

"JULY 12, 1892.
*Mr. George Arkle, Wheeling, W. Va.*

SIR—Your letters of the 7th inst. to me and to Mr. Har-

relson are both before me, and I have only a word to say in reply. I have given you fair notice of my intention in regard to you, and you will discover that I am not trying to bully or bluff you at all. After the Court disposes of the case your commission as J. P. and Notary Public, and your membership in the K. of H. will also be attended to. My friend Senator Kenna will attend to the one, and my friend M. Bellamy, Esq., will attend to the other. Perhaps you had better find out who I am, as you can do, by asking either of them or Judge Goff, or Honorable S. B. Elkins, Secretary of War. Court meets August 1st.

Respectfully,<br>A. M. WADDELL."

I received pocket-pook and all the other things, except the money, and delivered them to Mr. J. B. Harrelson.

I called on Marsden Bellamy and told him what had been written to me by Arkle. He said he had no recollection of seeing Arkle at Charleston, and never heard about the pocket-pook.

Defendant's evidence was as follows:

Marsden Bellamy: I have known the defendant Arkle for six years in Knights of Honor. A. M. Waddell showed me Arkle's letters. I did not tell Col. Waddell that I did not see Arkle at the meeting at Charleston. Arkle showed me no papers. I have no recollection of any conversation with Arkle. Arkle's character is good. I was in Charleston attending the Supreme Lodge of K. of H. I am Supreme Dictator of the order and during my stay in Charleston was very busy.

George Arkle: On May 9, 1892, I was on the train going from Wilmington to Florence. At a station between these two points a gentleman got on the train. From the way he threw himself down in his seat I thought he was

intoxicated. At station south of here he got off. I noticed the conductor and brakeman assist him in getting off the train. I went into smoking car and staid until I heard the passengers saying we were nearing Florence. Just before we got to Florence I went back into the ladies' car, where my wife was. My wife took the pocket-book off the window sill and said "I found this under the car seat" and handed it to me. I glanced through it and saw there were valuable papers and money in it. I put it in my pocket. We were then getting ready to get off the train at Florence. We lay over in Florence about two or three hours and then went on to Charleston, S. C. The next morning I spoke to Mr. Bellamy about it in the hotel office at Charleston, and asked him about Mr. Harrelson. He said he knew the name Harrelson but did not know his address. I asked Mr. Bellamy to look over the papers with me. He promised to do so, but was busy at the time and left Charleston without doing so. I deposited the pocket-book and contents in the hotel safe at Charleston. When I left Charleston I forgot it, and from Atlanta telegraphed to have it forwarded by express to Cincinnati, and from Cincinnati it was forwarded to me at Wheeling, W. Va. I reached home June 5th, and found a postal card notifying me that the express company had a package for me. Next day I got the package—the book and contents—and at once wrote to the Bank of New Hanover the following letter:

"WHEELING, W. Va., June 6th, 1892.

*Isaac Bates, Esq., President Bank of New Hanover, Wilmington, N. C.*

DEAR SIR—Do you know of any of your depositors losing anything of value recently? If so, please let me know at your earliest what it was and where it was lost, as I may impart to them some information in regard to the same. Also the name.　　　Very respectfully,

GEORGE ARKLE."

To this letter I received the following answer:

"WILMINGTON, N. C., June 8, 1892.
*Mr. George Arkle, Wheeling, West Virginia.*

DEAR SIR—Yours of 6th received. From time to time we have letters from our stockholders and depositors warning us of the loss of certificates of deposit and stock certificates. Lately, that is on the 9th of May, Mr. J. B. Harrelson, of Cerro Gordo, N. C., writes us that several certificates of deposit had been stolen from him. Is this the thing of value you refer to? We would be glad to give all the assistance we can in discovering the loss and repairing it to our depositor.

Yours respectfully,
W. L. SMITH, *Cashier.*"

The letter I wrote Colonel Waddell was written by Mr. Jordan, my lawyer, and copied by me. I had the book and contents, except the money, sent to Colonel Waddell September 22, 1892; this I retained and paid of it $25 to Colonel Arnett, $25 to Howard, and I kept the balance. I returned to the ladies' car a few minutes before I reached Florence, and my wife told me she had found the pocket-book on the car floor. Mr. Bellamy promised to examine the pocket-book and papers.

Mrs. George Arkle: I am the wife of the defendant. After my husband left the car to go to smoker I went forward to a seat near a lady who was having some trouble with her baby. I sat down and held the baby awhile; and while holding the baby my foot struck something on the floor. I picked it up and saw it was a pocket-book or memorandum book. When I returned to my seat I laid the book on the window sill at my seat. There were in the car a gentleman, the lady with the baby and myself. My husband was then in the smoking car. Mr. Arkle came

into the car, and said 'We are very near Florence.' I began to pick up my wraps, when I noticed the pocket-book. I called Mr. Arkle's attention to it: He took it off the window sill, opened it, and said 'it contains valuable papers.' We then were near Florence, where we got off.

W. W. Arnett: I am a practicing attorney. My home is Wheeling, West Virginia. Know the defendant; his character is good. After Arkle's return from Charleston, I heard about the book. I was employed by Arkle after the requisition was taken out for him. Arkle placed the package in the hands of Howard, the prosecuting attorney, with instructions to forward to Colonel Waddell. Howard could not find it for some time. I saw the package in Howard's hands; it contained the money and all. Arkle told me to have package sent to Colonel Waddell. I did not see Arkle give Howard the money. Arkle paid me $25 after requisition was served. I appeared for him. I don't know where he got the money. He paid me for legal services in fighting requisition. The package was sent by Howard, and the reason the $140 was not was because Arkle was under the impression that the owner had consented that he retain the $140 for his trouble.

*Rebuttal by State.*

N. McPhaul: I am the Sheriff. I went to West Virginia with the requisition. Defendant's character in Wheeling is bad. Several parties told me things against him. Said he had taken up a lot of people and put them in jail to get his fees.

J. P. Williams: I saw Harrelson the night he got on the train when he lost his pocket book. He was sober when he got on the train.

W. W. Arnett recalled by the defendant: These people spoken of by Sheriff McPhaul were all arrested on warrants

STATE *v.* ARKLE.

sworn out by the prosecuting attorney, and everyone was convicted. It was a lot of gamblers and prostitutes, etc.

The defendant asked the following special instructions—

1. If the jury shall find that the defendant took the pocket-book, money, etc., from his wife or from the window sill with the intention of returning it to the owner, but afterwards decided to keep the money, this would not be larceny and you should acquit him—for the State must show that the felonious intent was contemporaneous with the finding. (Given.)

2. If the jury shall find from the evidence that the book, money, papers, etc., came into possession of the defendant in South Carolina, then in no event can defendant be convicted in this State., and the jury should acquit the defendant. (Given.)

3. There is no evidence of felonious intent, and the Court directs the jury to acquit the defendant. (Refused.)

4. If the jury shall find from the evidence that Mrs. Arkle, defendant's wife, picked up the pocket-book, containing papers and money and afterwards turned them over to the husband, the receiving by defendant is not receiving stolen goods, knowing them to be stolen. (Given.)

5. If the jury shall believe from the evidence that Mrs. S. Arkle, the defendant's wife, found the pocket-book or memorandum book and contents, picked them up while the defendant was not in the car; kept them as she testified until he returned to the car from the smoking-car, and then delivered them to the defendant, he cannot be guilty of the larceny of goods lost and found, as he was not the finder or present at the finding. (Refused.)

The Court gave instructions 1, 2 and 4 as asked, and declined to give Nos. 3 and 5. In addition, the Court charged the jury that lost property may be the subject of

larceny—and read the section in Greenleaf on Evidence, relating to larceny of lost property.

1st. The Court told the jury that if they believed that the defendant found the pocket-book in North Carolina, and instantly upon finding it conceived the purpose and intention of feloniously appropriating it or the money or contents to his own use so as to deprive the owner of it, he would be guilty of larceny, and the State must show this beyond a reasonable doubt.

2d. That if the jury shall be satisfied fully from the evidence that the defendant's wife found the pocket-book as testified to by her, and that while in the State of North Carolina she called her husband's attention to it and told him she had found it and handed it to her husband, and he instantly upon taking it and while in said State, conceived the purpose and intention when he received said property to feloniously appropriate it to his own use, for the purpose of deriving gain or money for himself and to deprive the true owner of it, the defendant would be guilty of larceny, and the State must show this beyond a reasonable doubt.

3rd. The Court then stated the contentions of the State and defendant and recited the evidence on both sides for State and defendant.

There was a verdict of guilty. A motion for new trial was refused, and from the judgment the defendant appealed, assigning error as follows:

1. Error in refusing prayers Nos. 3 and 5.

2. Error in that His Honor charged the jury, leaving it to the jury to determine where the defendant found or came into possession of the pocket-book, etc. Whereas, His Honor should have instructed the jury that there was no evidence that the pocket-book, etc., was found in North Carolina or received by the defendant therein, and that this Court has no jurisdiction.

3. Error in charging the jury (paragraph 1 of charge) that if at the time the defendant found the property he then and there intended to appropriate it, etc., thus predicating his charge upon the idea that the defendant was the finder, when the evidence shows that the defendant was not the finder, and His Honor should so have told the jury.

4. Error in charging paragraph 2 of charge.

*The Attorney General*, for the State.

*Messrs. Lewis & Burkhead* and *J. B. Schulkon*, for defendant (appellant).

FAIRCLOTH, C. J. :   The defendant was indicted for stealing a pocket-book containing money, bank certificates and a check payable to the prosecutor, also for receiving the same knowing that they were stolen property.   The second count was withdrawn and is out of the case.

In every instance there must be an original, felonious intent, general or special, at the time of the taking or finding of lost property, in the mind of the accused, to constitute larceny.   If such intent be present, no subsequent act or explanation can change the felonious character of the taking.   If it be not present, it is only a trespass and cannot be made a felony by any subsequent misconduct or bad faith in the taker.   " The omission to use the ordinary and well known means of discovering the owner of goods lost and found, raises a presumption of fraudulent intention, more or less strong against the finder, which it behooves him to explain and obviate ; and this is most readily and naturally done by evidence that he endeavored to discover the owner, and kept the goods safely in his custody, until it was reasonably supposed that he could not be found, or that he openly made known the finding, so as to make himself responsible for the value to the owner when he should

appear.   In this class of cases it is material for the prosecutor to show that the felonious intent was contemporaneous with the finding." 3 Greenleaf Ev., Sec..159 ; Rapalje on Larceny and Kindred Offences.

It is urged by the Attorney General that the defendant's delay from May 9 to June 6 to disclose the fact that he had possession of the pocket-book, with internal evidence of the ownership, was some evidence of an original felonious intent and was sufficient to be submitted to the jury.   If that were so, it could only relate to the receiving of the pocket-book from his wife, as there is no evidence that he was present at the finding of the lost article, and the count for receiving is not before the Court.   We do not think, however, that the evidence was such as ought to be submitted to a jury.   His explanation is found in his letters used by the State, in which it appears that on the day after his return to his home in Wheeling, West Virginia, from a Southern tour, he made a proper and reasonable effort to discover the owner by writing to the bank at Wilmington, which had issued the certificates, &c., and in a few days explained the whole matter to the owner and kept his property safe for him.   Without this _voluntary_ disclosure, the prosecutor had not a scintilla of evidence by which he could trace his property or the defendant.   Our views on such evidence as we think should not go to the jury were fully expressed in _Young_ v. _Railroad_, at this Term.   The further delay in the matter seems to be the result of some feeling engendered by the correspondence, and because defendant demanded compensation or reward.  This does not affect the main question.   In _Regina_ v. _Gardner_, L. & C. Crown Cases, 243, this case is found:   Bougher, a lad fourteen years old, found a check and soon showed it to the defendant, who took it and refused to return it.   He knew and saw the owner but held the check for a reward, and the

jury so found. Held by the Court that the facts do not show any felonious intent, and that the mere withholding the check did not amount to such a taking as is required to constitute the offence of larceny.

New Trial.