Justice NEWBY
concurring.
I concur fully with the majority opinion. I write separately to observe that this case presents an excellent example of the common law at work today, applying age-old tangible property principles to the modem, intangible electronic-banking context. As the Chief Justice well notes in his opinion, it is the knowing exercise of dominion and control over property to the exclusion of the true owner that “trespasses” on the owner’s property rights and effectuates larceny. His candy store hypothetical is a good example. I write separately to amplify this point by taking this opportunity to answer the timeworn question arising from the iconic film It’s a Wonderful Life-. Was Old Man Potter simply morally corrupt or was he also guilty of a crime?
The role of the Court is not to devise the common law but to recognize and apply its lasting principles. See Penny v. Little, 4 Ill. (3 Scam.) 301, 304 (1841) (opinion of Stephen A. Douglas, father of Justice Robert M. Douglas of the North Carolina Supreme Court) (“The common law is a beautiful system; containing the wisdom and experience of ages ... and ajdapting itself to the condition and circumstances of the people . . . .”); see also Reg. v. Ramsey [1883] 48 L.T. 733 at 735 (Eng.) (Lord Coleridge CJ) (“[L]aw grows; and . . . though the principles of the law remain unchanged,... their application is to be changed with the changing circumstances of the times.”); 1 William Blackstone, Commentaries *73 (The “chief comer stone of the laws ... is general immemorial custom, or common law, from time to time declared in the decisions of the courts of justice: which decisions are preserved among our public records, explained in our reports, and digested for general use.”)
*638 North Carolina law has long recognized that when an individual finds property, and is unaware of its true owner, that individual has no legal duty to locate and return the property to the true owner. See State v. Roper, 14 N.C. (3 Dev.) 473, 474-75 (1832) (opinion of Daniel, J.) (A bona fide finder of lost or abandoned property, who later “appropriate[s the property] to his own use,” is not guilty of larceny.); see also State v. West, 293 N.C. 18, 30, 235 S.E.2d 150, 157 (1977) (“[T]he owner of articles of personal property may terminate his ownership by abandoning it and, in that event, title passes to the first person who thereafter takes possession.” (citation omitted)). Nonetheless, we applaud the high morals of one who does.
On the other hand, when an individual possesses property with the knowledge of its true owner, and exercises dominion and control over the property for his or her own purposes, thus trespassing on the true owner’s property rights, that individual has committed larceny. See State v. Farrow, 61 N.C. (Phil.) 161, 163 (1867). It is not the unintentional receipt of the property that makes the act larceny, but the knowing exercise of control over it. See id.; Roper, 14 N.C. (3 Dev.) at 474-75; see also State v. Arkle, 116 N.C. 1017, 1031, 21 S.E. 408, 408 (1895) (“[T]here must be an original, felonious intent... at the time of the taking or finding of lost property... to constitute larceny.”).
Here defendant knowingly exercised dominion and control over the mistakenly deposited funds to the exclusion of West. Evidence showed that West immediately put defendant on notice of the company’s error and that defendant knew the money was West’s as early as 12 July 2012, well before his ATM withdrawals and electronic transfers on 15 July 2012. See Roper, 14 N.C. (3 Dev.) at 474-75. Logically, if West had lost or abandoned its ownership interest, West would not have immediately contacted defendant and his bank. Moreover, defendant could not have been mistaken about the money’s ownership, given both West’s notice to him and that his initial request was for only $1200. See id. at 475 (“If money, by mistake, is sent with a bureau to be repaired, and it is taken with felonious intent, it will be a larceny . . . .”); see also 50 Am. Jur. 2d Larceny § 32, at 42 (2006) (“Where money ... is delivered by mistake, and the receiver takes it with knowledge of the mistake and with the intent to keep it, the offense is larceny, since there is no consent on the part of the owner to part with the excessive amount_”). Thus, defendant committed larceny.
While the Chief Justice’s opinion applies such long-standing common law principles to the modem banking context, the principles are *639 equally applicable to situations arising in the past. Thus are we able to use them to answer the question, lingering in the minds of many, as to the criminal culpability of Old Man Potter. See It’s a Wonderful Life (Liberty Films 1946).
In this beloved film, on Christmas Eve morning in 1945, Uncle Billy goes to Old Man Potter’s bank to deposit $8000 in cash[1] for his family’s benevolent business, the Bailey Brothers Building & Loan Company. While Uncle Billy is preparing his deposit slip in the bank lobby, Potter arrives with newspaper in hand. Uncle Billy turns to greet him and cannot help but good-naturedly needle crotchety Potter, who had greedily sought to quash the struggling Building & Loan Company for some time. Uncle Billy grabs the newspaper from Potter and proudly points to the picture of his nephew Harry on the front page—the war hero returning home. Potter angrily snatches the newspaper back, in which Uncle Billy had mistakenly folded the $8000 cash. At this point no crime has occurred; Uncle Billy has misplaced his money and Potter is unaware of his possession of it. See Roper, 14 N.C. (3 Dev.) at 475 (Though the defendant had possession of a lost shawl, he lacked felonious intent and was not guilty of larceny while simply returning it to the true owner.).
Back in his bank office, Potter unfolds the newspaper and discovers the money. Meanwhile, Uncle Billy attempts to make the deposit and, in horror, finds that he has misplaced the funds. Potter begins to return with the money to the lobby, but upon opening his office door he observes Uncle Billy searching frantically. Potter “puts two and two together,” realizing the loss of funds will ruin George Bailey and his Building & Loan Company. Potter closes the door, keeping the $8000 cash. Armed with the knowledge that the money belongs to the Building & Loan Company, Potter exercises dominion and control by keeping the funds, and has thus committed larceny. See id. at 474-75.
That same day, the state bank examiner began auditing the Building & Loan Company, which now faced unavoidable collapse given the $8000 shortage. At his wits’ end, George pleads with Potter for a loan to save the business. In response, Potter not only does not confess that he has the Building & Loan Company’s money, but instead brazenly inquires of George whether he had lost the money, possibly by “playing the markets” or through an extramarital affair. See id. at 474 (The finder’s “subsequent appropriation in a secret manner, or his denial *640 of any knowledge of the goods, or any other acts showing a felonious intent, would be evidence [supporting larceny].” (emphasis added) (citations omitted)). Ultimately, Potter phones the police to arrest George for “misappropriation” of company funds.
Facing certain tragedy, George attempts to take his own life. The attempt is cleverly thwarted by Clarence, an angel looking to earn his wings. Clarence helps George appreciate that, despite the current seemingly overwhelming challenges, life is worth living. George favors life over death. When he finally returns home to face whatever consequences may occur, George finds that the community has rallied around him, accumulating the necessary funds to save the Building & Loan Company and his reputation, just in time for Christmas.
So the story ends. George has a wonderful life. Clarence gets his wings. Old Man Potter is a morally bankrupt individual, but an unin-dicted felon. And we continue our quest to apply ageless common law principles to our ever-changing modem world.

. $8000 adjusted for inflation would be approximately $107,483 today. See U.S. Dep’t of Labor, Bureau of Labor Statistics, [Consumer Price Index] Inflation Calculator (2017).