1. Because he stood not to the prosecutor in the relation of a servant, which the statute requires, and the indictment describes.
2. Because the goods embezzled came not to his hands by a delivery of the nature of that described in the statute and the indictment.
I. They said that the words of a statute are to be taken in their ordinary and most known signification, not so much regarding the propriety of grammar as their general and popular use; and cited 1 Comm., 59.
Now, the statute requires that the offender be a servant. Perhaps this word, in its most extended grammatical sense, may include every person laboring for another, and receiving hire or payment. In its ordinary and popular signification, it reaches no further than family domestics and personal attendants. The painter who draws my picture, the surgeon who pulls out my tooth, the tailor who makes my clothes, the clerk who writes in my office, or attends to my store, are in the first sense my servants; they all labor and are employed by me, and receive payment. Yet, were I to describe them by the appellation of my servants. I would not be understood to mean them; or, if I was, I should be censured for giving them an appellation which in the general and popular acceptation of it is confined to persons of an inferior rank.
A celebrated crown law writer, after speaking of the statute upon which the prisoner is indicted, and the 3 and 4 Will. and Mar., 9, says "to the foregoing larcenies, by breach of trust, by MAENIAL servants, and lodgers, the Legislature has added two others," etc. 1 Hawk., 139, sec. 17. He certainly understood that the servants to which the statute relates are only such as are maenial, who live intra maenia within the walls; in other words, DOMESTIC servants.
The author of the commentaries, after mentioning maenial servants, apprentices, and laborers, says "there is a fourth species of servants,if they may be so called: stewards, FACTORS and bailiffs." 1 Comm., 427, which shows that, in his apprehension, the epithet of servants, in ordinary and popular use, is not applicable to stewards, factors, etc. (38)
The same writer, in the next page, says, "A master may by law correct his apprentice or servant." Does he mean that a gentleman could flog his steward, or a merchant his factor? Certainly, no.
If the rule of construction, which we have laid down from the commentaries, be a true one; and if the word servant, in its common and popular use, does not comprehend that description of persons employed in the capacity in which the prisoner attended the affairs of the prosecutor, it follows that he did not stand to him in the relation contemplated by the statute. *Page 46 
This construction would be the true one in ordinary acts, but this is a penal statute — one penal in the highest degree. Penal statutes must be construed strictly. 1 Comm., 88. Consequently should the word servant be restrained to its ordinary signification.
II. The statute confines the things which may be subject of the offense to such as caskets, jewels, money, goods, and chattels, as are delivered to servants safely TO BE KEPT to the use of their masters or mistresses.
The evidence here is of goods delivered TO BE SOLD.
And I contend that this case is also within the words of the act. The words master and servant, according to their popular use, imply a certain relationship, and wherever that relationship is found there is properly a master and servant. This relationship consists of the right of superiority and command on one side, and the duty of service and obedience on the other, and this certainly exists between a merchant and his clerk. The nature of the service is an immaterial circumstance; for whether a man assume the care of a stable or store, the (39) business of a groom or clerk, he is still a servant; if he has taken upon himself the duty of obedience, and given the rights of authority to another. The right to command, the obligation to obey, is equal in both cases. The time and service in both instances equally belong to the hirer. The contract which produces the relationship is the same, and therefore the relationship itself is the same. The politeness of modern times, it is true, has not often applied this term to merchants' clerks, some of whom are of good families, and would resent the appellation; but this by no means proves that they are not, as clerks, substantially servants, and therefore strictly within the meaning of this act.
The term servants, in common language, is very seldom applied toapprentices, to merchants, and to several kinds of artificers; yet it never has been denied, I believe, that they are properly servants, and but for the express exception, would, as such, be within the act. *Page 47 
The very expression, "MAENIAL servant," which is very common, implies that there are servants of a different kind, and otherwise the epithetmaenial would be insignificant and useless.
The word servant is used in the act without any epithet to qualify for limit its meaning, and yet it is contended that this general term, which applies equally to all kinds of servants, shall be confined to one kind only, to wit, maenial servants. Had such been the intention of the Legislature, that common expression must have occurred to them, and would certainly have been adopted. I admit that the mechanic to whom we send a job is not our servant, nor do the principles for which I contend imply that he is. There is no authority on one side, no subjection on the other. The mechanic is employed, not directed. His time is his own, not ours. He may postpone our work to make room for another's. The relationship between him and us supposes no superiority on our side, and therefore it is not the relation which exists between master and servant.
As to the second point.
The goods, it is true, were entrusted to the prisoner to be sold, but they were also in his custody to be kept till the sale, and at the time of embezzlement they were in his keeping, not having then been sold. His authority to keep had not then expired; he therefore held them under that authority, and therefore his case is within the act.
Until a fair purchaser offered, his authority was merely to keep. (40)
Neither of these objections is entitled to much favor. The first admits that persons standing substantially in the same situation with the prisoner, only performing different services, and furnished by the nature of their employments with less power to do mischief, would for the same act be punishable as felons. The second admits that the prisoner, who attempted to ruin his employer by embezzling his property, was entrusted to sell it for his benefit, was under engagements, and had received wages for that purpose.
Admitting, however, that the prisoner is not to be considered as a servant, and that the goods were not delivered him to keep, admitting that he is not within the reach of the statute, then he is guilty of larceny by the common law.
It is true that a taking is essential to a larceny; and it is said that this offense cannot be committed where there is a delivery of goods from the owner to the offender upon trust. And the instances mentioned are the loan of a horse, and the sending of goods by a carrier. These instances, however, it is to be observed, differ widely from the present case, the owner in these instances parting entirely with the possession, which, for the time belongs exclusively to the carrier and borrower, each of *Page 48 
whom has a special property in the thing delivered. In the present case the offender had not the exclusive possession. The owner had not parted with his possession. The goods were in his store, subject to his control and direction, which he occasionally exercised. Had a trespass been committed on these goods, the clerk could not have maintained an action in his own name, but the suit must have been brought in the name of the owner. During every moment of time whilst the prisoner was in the owner's store, the owner might have done whatever he pleased with the goods. The store in which the goods were kept was in his possession, nay the prisoner himself was in his possession (if I may so speak), having engaged to serve him for hire. As the owner had not parted
with the possession of the goods, of course the prisoner could not have
the possession of them. If he had anything, therefore, it was only a care and oversight, and the embezzlement of goods in such a case was felony at the common law. The distinction is clearly expressed in 4 Blackstone, 231. If he had not the possession, but only the care (41) and oversight of the goods, the embezzling of them is felony at the common law. Here the goods were under the prisoner's care, not in his possession.
It remains, therefore, only to show that though the indictment be founded on the statute, the prisoner may be found guilty of the offense at common law, and to this the 2 Hawk P. C., 251, is in point.
Whereupon Harris and Martin prayed to be and were heard on the latter part of the argument of the counsel for the State. They said —
The charge against the prisoner presenting itself under another point of view, it behooves us to consider whether the facts charged in the indictment constitute an offense at common law.
Unless it was an offense at common law at the time that statute was passed, it is certainly none at this day. Of this the statute furnishes us a negative proof. In the preamble it is said, after stating such a fact as the one in the indictment, which misbehavior so done, was doubtful at the common law, whether it was felony or not.
The preamble of a statute is deemed true, and a good argument may be drawn from it. 2 Inst., 11.
Hence, it must be deemed true that it was doubtful. If it was doubtful
THEN, it cannot be certain NOW. With this negative evidence in our hands, we ought not to fear an adverse verdict; we may claim a favorable one. For in dubiis semper in favorem vilae.
Yet, in taking a retrospective view of the principal and most important decisions of Courts before the reign of Henry VIII, we will, perhaps, incline more strongly to believe that when the statute was *Page 49 
passed the offense under our consideration was deemed a private injury
only, and no criminal offense.
We do not mean to say that the time never was when such a misbehavior was considered as a criminal offense, nay as felony. In England, as in every other country, during the early age of civil society, no difference was made between moral and civil offenses. Many facts were considered as larcenies, which have since been looked upon only asprivate injuries; thus bailiffs, receivers, and administrators were said tosteal goods, if they did not give in their accounts; false weights and measures, tricks in trade, and other deceits and impositions are described in the Mirror as instances of larceny. 2 Reeves, 351. (42)
Towards the year 1470, under the reign of Ed. IV, it was held that where a person entrusted goods to the care of a servant, the servant could not take them feloniously, because they were in his possession. 10 Ed. IV, 14.
About three years after the following case happened:
One had bargained with a man to carry certain parcels of goods to Southampton. The man took the parcels, carried them to another place, broke them open, took out the goods, and converted them to his own use. Whether this was in law a larceny was debated with much difference of opinion. It was argued that a possession of the goods was given by the bailment of the owner; and neither felony nor trespass could be committed of them by the bailee; for he could not be said to take them vi et armis and contra pacem. On the other side it was said that a man's act becomes felony or trespass according to the intent. If a man abuses a distress, he is a trespasser; and so here all confidence implied in the bailment was superseded by the taking, which discovered his intent to have been bad from the beginning. It was also said that this was different from a bailment, for it was only abargain to carry; and what followed shows that this was only a pretense to gain an opportunity for stealing. At length, one of the justices had recourse to a refinement which admitted some of the above reasoning, but exempted this case from the conclusion following upon it. He admitted that a man who has the possession of goods by bailment, cannot commit felony of them; but here, he said, the goods within the parcels were not bailed to the carrier, but the parcels themselves; and therefore taking them was not felony; but when he broke them open and took out the goods, he did what he had no warrant for, and appeared in a very different light in the eyes of the law. Thus, for instance, if you deliver a tun of wine to a carrier and he sells it, this is neither felony nor trespass; but if he takes any out of the tun and sells it, that is felony. In like manner, if I leave the key of my chamber with any one, and he takes anything out *Page 50 
of it, this is felony. The reason to support these cases was that the things not specifically and expressly delivered were not in truth bailed, and therefore the party, in taking them, intermeddled where he had no trust.
(43) These were the arguments used before the council; the case was afterwards adjourned into the exchequer Chamber, and the opinion of all the Judges was taken. There it was agreed by all the Judges except one, that generally where goods were bailed to another, he could not take them feloniously. They held, also, that when a possession so obtained had once determined, then the bailee might commit felony in taking them; as, if I bail goods to a man to carry them to my house, which he performs, and afterwards takes them, it is felony; because his possession under the bailment ceased when he delivered them at the house. They argued some points upon the nature of possession. If a guest in an inn takes a cup, he is a felon, because he had not properly a possession, but only the use of it while there. The same of a cook or butler; they are only ministers as to the things within their care, but have no possession, which, in these cases, is always construed by law to be in the master. But it would be different, perhaps, says the book, if goods were bailed to a servant; for as they then would be in the actual possession of such servant, he could not commit felony of them.
After all, as to the principal case, whether it was agreed that the bailment ceased upon breaking the parcels open, and the carrier thereby forfeit the legal privileges annexed to him as bailee, and in so taking the goods he was considered a common person; or whether it was upon the whole thought that this was not a bailment but merely a bargain to carry; it is not stated in the report upon which of these grounds they determined, but it was certified to the Chancellor by the major part of the Justices, that this man was guilty of felony. 3 Reeves, 410.
Towards the year 1485, some questions of larceny similar to the one above cited were debated.
It was propounded by HASSEY, who was then Chief Justice, whether, if a shepherd took the sheep, or a butler the plate, under his care, it could be called felony; he himself thought it was, and related the case of a butler who was hanged under such circumstances; to which a similar case was added by Haugh, of a goldsmith who had taken some things that were entrusted to his charge. In answer to these, Brian
argued that it could not be felony, because neither of these persons could be said to take the things vi et armis, while he had them under his care; and of this opinion were the justices. This was giving a blow (44) to the determination in the time of Edward IV, and expressly *Page 51 
contradicted some cases that were there taken for settled law, and argued upon as such; especially that of the butler. However, we find this case of the butler was understood otherwise some years after and a distinction was taken between the possession a butler has while in the master's house, and the possession of a servant entrusted out of the house. It was propounded by Sergeant Pigot, in the Court of King's Bench, to Sergeant Culter, in this way: If I bail a bag of silver to my servant to keep, and he goes away with it, can this be felony? Cutler says yes; for as long as he is in my house, or with me, that which I have delivered to him is adjudged in my possession; thus if my butler, who has my plate in his custody, runs away with it, this is felony; the same if a person having the care of my horse goes off with it, because in both these cases the thing remained all along in my possession. But if I deliver a horse to my servant to ride to market, and if he rides away with it, this is no felony, because he came to lawful possession of the horse by the delivery out of my custody. The same if I give him a bag to carry to London, or to pay away to some one, or to purchase something; if he goes away with these it would not be felony, because they were out of my possession, and he had lawful possession of them himself. To this Pigot assented, adding that it might, in all these cases, have an action of detinue or account, which idea of possession is consonant to one of the principles laid down in the case of often alluded to. 4 Reeves. 178.
In the time of Henry VIII, says Mr. Reeves, a breach of trust and embezzlement of effects confined to the custody of a person, were thought not to be a felonious taking and carrying away. This kind of fraud had of late grown common, from the impunity it enjoyed; and many now thought that, as it carried in it much of the mischief, it deserved the punishment annexed to felony.
The statute upon which this man is indicted was accordingly passed. It is mentioned in the preamble of this act, as a doubt whether this kind of taking was larceny; a doubt raised, perhaps, by the case determined in 13 Ed. IV, which we have before mentioned and which is thought, and not improbably, to have given some occasion for making this statute.
Though the instance of bailment there before the Court was, (45) or might be thought, something like a breach of trust reposed in servants, and was determined to be felony, yet the principles there laid down and agreed to almost unanimously, led to an opposite conclusion; and there needed all the helps of distinctions and technical nicety to take even that case out of the general rule there laid down. Besides, there is at the bottom of that report an opinion, which qualifies any *Page 52 
inference which otherwise might be possibly drawn from it as to this; for admitting that a cook and butler would be guilty of felony if they converted the goods within their respective departments to their own use, it is there said that if the same things were bailed to a servant, perhaps, as they would be in his possession, he could not commit felony of them. About three years before, it was said by one of the Judges: "If one commits the care of his goods to his servant, the servant cannot take them feloniously, because they were in his possession." These were direct authorities upon the point, and, joined with the reasoning upon bailment
and possession, sufficiently show what were the opinions of lawyers in those times respecting this question. 4 Reeves, 284.
The case of the carrier, the butler, the guest, fall short from the present. Their possession and power over the things in their hands were temporary. They could not transfer the property; the master was, at all events, to have it back again. In no case was it to be otherwise. In this, the clerk might when he pleased, lawfully dispose of the property, that it should never return to the merchant. His possession was quite of a different nature. Theirs to keep; his to sell.
So strictly have courts adhered to the notion of possession and its consequences, that in 3 Hen. VII, the Judge went so far as to agree with Brain (who, it may be observed, was one of the Judges that dissented from the opinion of felony in 13 Ed. IV, in the exchequer Chamber), that neither a shepherd nor a butler could commit larceny of their sheep or plate, because it could not be done vi et armis; so much were the opinions changed from what they had been in the reign of Ed. IV, when these cases were stated for felony, and allowed without debate. This doctrine, we have seen, was again discussed in the last reign; and it seemed, in the instance there stated, to be agreed upon so (46) decidedly against the felony, as to call for a formal declaration of the law by statute. Thus stood the law upon this subject towards the end of Henry VII's reign, and so we may suppose it was understood at the time this statute was made. After all these authorities, concludes Mr. Reeves, we may be excused in differing from those who think that the point of law which is the subject of this statute was so well settled before, that the doubt about it mentioned in the preamble is one of those which have much enervated the principles of common law, and could not be the doubt of any lawyer. 4 Reeves, 285.
Lord Hale considers the offense charged on the indictment, as created by the statute. For, he says: Before the statute of 21 Hen., chap. 8, 7, if a man had delivered goods to his servant to keep or carry for him, and he carried them away animo furandi, this had not been felony, but by thatstatute it is made felony if of the value of forty shillings; but *Page 53 
the offender shall at this day have his clergy; but yet if an apprentice doth this, or if a man delivers a bond to his servant to receive money, or delivers him goods to sell, and he accordingly sells and receives the money and carries it away animo furandi, this is neither felony at common law nor by this statute. 2 H. H. P. C., 505.
The same doctrine is laid down, Co. P. C., p. 105, 26 H., 8 Dy. 5, a. b.
Having, we trust, satisfactorily shown, first, that the prisoner is not within the reach of the statute, and secondly, that the facts charged do not constitute the offense of larceny, we proceed to show that even if the prisoner was guilty of larceny, he cannot be convicted of it upon the indictment which the grand jury have found against him.
It is not contended by the counsel for the State, that if he be guilty of any offense at common law, he may be guilty of anything else but larceny.
Hawkins has been read, in order to establish the position that, though an indictment be founded on a statute, the prisoner may be found guilty of an offense at common law.
Although the truth of this position, in a certain degree, is not to be denied now, it is safe to say that it is not generally much less universally true. The origin of it may be traced to Page's case. The court, in that case, decided that if persons be indicted, especially on the statute of stabbing, 1 Jac., 16, 6, 351, and the evidence be not sufficient (47) to bring them within the statute, they may be found guilty of general manslaughter, at common law, and the words contra formamstatuti rejected as senseless.
If the present indictment did not include contra forman statuti, it would be insufficient, and no judgment could be given upon it, because the offense charged is only prohibited by statute and not by the common law. See 2 Hawkins, 251.
If an indictment on the statute of stabbing, above cited, did not conclude contra formam statuti, still it would be sufficient and good; judgment could be given upon it, as in the case of general manslaughter, or manslaughter at common law, because the facts charged in such indictment are offenses both at common law and under the statute.
The same verdict and judgment may be given upon such an indictment, concluding contra formam statuti, in case the evidence does not bring the prisoner within the statute.
Thus if one be indicted, on the 3 El., 9, 304, for perjury, and it be not stated that he willfully and corruptly committed perjury, but either that he falsely and voluntarily, Savil, 43, or falsely and corruptly, Hetl., 12, or falsely and deceptively, 2 Leo., 3 Leo., 230; Shower, 190. In all these cases the indictment is bad for an offense on the statute, but is good at common law. *Page 54 
Yet, if the fact proved amounted to the crime of larceny, still the prisoner at the bar could not be found guilty of that offense, because it is not charged in it.
It is not sufficient that the offense charged be prohibited both at the common law and by the statute, in order to support a verdict, by rejecting the words contra formam statuti; it is still necessary that the technical words, requisite in the description of the offense at common law, be inserted in the indictment.
An indictment ought to have proper terms of law. 4 Comyns, 398.
The word cepit is necessary and requisite in an indictment for larceny. 2 H. P. C., c. 25, § 55, p. 224; no other will answer.
It is not in the indictment.
The position establishment in the latter part of the argument for the State is neither universally or generally true. It is true only in the case of indictment respecting facts prohibited, both at the (48) common law and by statute; neither is it true in all such cases, for it will fail, if the indictment does not contain a technical description of a common law offense.
I. The prisoner, therefore, cannot be found guilty under the statute.
1. Because he does not stand in that relation which the statute requires, and the indictment describes.
2. Because the goods did not come to his hands by the delivery, whichalone can bring his offense within the statute.
II. He cannot be found guilty at the common law.
1. Because the facts charged are made criminal by the statute only.
2. Because the offense of larceny is not charged in the indictment.
ASHE, J., thought he might be found guilty at common law, but could not
be convicted on the statute.
The jury withdrew, and found the prisoner not guilty of the felony upon the statute, but guilty of the felony at common law.
On the next day, the prisoner was brought to the bar, and being asked what he had to say, etc.
Harris and Martin moved an arrest of the judgment, and filed reasons.
The counsel for the State, not being ready to enter upon an argument on this motion, the consideration of it was postponed till next court; and
On motion of the prisoner's counsel, it was ordered that the prisoner be discharged from confinement, on his giving bail, before some of the justices of the county of Craven, residing in the town of New Bern.
In September, 1792, there was no Court. *Page 55 
And at March Term, 1793, the consideration of the motion in arrest of judgment was taken up, and without any argument.
JUDGMENT ARRESTED.
* * * The prisoner had remained in jail, not being able to procure bail upwards of a twelve months and Mr. Solicitor-General Jones (partly out of compassion to him, and partly on account of the late hour at which the Court came to the cause, on the last day of the term) did not oppose the motion in arrest.
(49)