STATE OF NORTH CAROLINA v. ROBERT DENNIS WEAVER, JR.

No. 613A03

(Filed 4 February 2005)

**1. Embezzlement— aiding and abetting—sufficiency of evidence**

The trial court erred by denying defendant's motion to dismiss the charges of embezzlement and conspiracy to embezzle both based on the theory that defendant aided and abetted embezzlement committed by his former wife, because: (1) defendant cannot be convicted of aiding and abetting embezzlement without proof that an embezzlement was committed; (2) the lawful possession or control element of the crime of embezzlement was not satisfied when an administrative employee took a corporate signature stamp without permission and wrote unauthorized corporate checks thereby misappropriating funds from her employer, and these facts appear to support the crime of larceny rather than embezzlement; (3) defendant's former wife was not her employer's agent and she never lawfully possessed the misappropriated funds; and (4) it is immaterial whether the former wife had actual or constructive possession of the misappropriated funds when her possession was not lawful, and thus, the crime of embezzlement has not occurred.

**2. Appeal and Error— writ of certiorari—improvidently allowed**

Defendant's petition for a writ of certiorari under N.C.G.S. § 7A-32(b) to review additional issues which were briefed and argued before the Court of Appeals but were not resolved in its opinion was improvidently allowed.

Justice NEWBY did not participate in the consideration or decision of this case.

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 160 N.C. App. 613, 586 S.E.2d 841 (2003), reversing judgments entered 4 December 2001 by Judge Michael E. Helms in Superior Court, Buncombe County. On 5 February 2004, the Supreme Court allowed defendant's petition for writ of certiorari to review additional issues not resolved by the Court of Appeals. Submitted on 14 September 2004 for decision on

**STATE v. WEAVER**

[359 N.C. 246 (2005)]

written briefs pursuant to Rule 30(d) of the North Carolina Rules of Appellate Procedure.

*Roy Cooper, Attorney General, by David L. Elliott, Assistant Attorney General, for the State-appellant/appellee.*

*Cloninger, Lindsay, Hensley & Searson, P.L.L.C., by Stephen P. Lindsay, for defendant-appellee/appellant.*

BRADY, Justice.

The dispositive issue presented for review on direct appeal is whether the lawful possession or control element of the crime of embezzlement was satisfied when an administrative employee took a corporate signature stamp without permission and wrote unauthorized corporate checks, thereby misappropriating funds from her employer. That employee's misappropriation is the basis of defendant's convictions for aiding and abetting embezzlement and conspiracy to embezzle. We conclude that the employee did not lawfully possess or control the misappropriated funds and therefore affirm the decision of the Court of Appeals which reversed defendant's convictions.

On 6 August 2001, defendant was charged pursuant to N.C.G.S. § 14-90 with two counts of aiding and abetting his wife, Kimberly Weaver, to embezzle funds from International Color and with nineteen counts of aiding and abetting Kimberly Weaver to embezzle funds from R&D Plastics, Inc. (R&D). Defendant was similarly charged pursuant to N.C.G.S. § 14-2.4 with a single count of conspiracy to commit embezzlement from International Color, L.L.C. (International Color) and R&D. Defendant was tried at the 26 November 2001 Criminal Session of Superior Court, Buncombe County before the Honorable Michael E. Helms. On 4 December 2001, a Buncombe County jury returned a verdict finding defendant guilty on all twenty-two counts and Judge Helms sentenced defendant to seven consecutive eight-to-ten month terms of imprisonment. Judge Helms also imposed suspended sentences of eight-to-ten months on fourteen convictions for aiding and abetting and a sentence of six-to-eight months for conspiracy to commit embezzlement.

Upon entry of judgment, defendant gave notice of appeal in open court. On 21 October 2003, a divided panel of the Court of Appeals reversed defendant's convictions on all counts. *State v. Weaver*, 160 N.C. App. 613, 622, 586 S.E.2d 841, 846 (2003). On 24 November 2003, the State filed a notice of appeal pursuant to N.C.G.S. § 7A-30(2).

**STATE v. WEAVER**

[359 N.C. 246 (2005)]

## FACTUAL BACKGROUND

The record reflects that several members of the Weaver family are involved in this factually complex case. Defendant's parents started R&D, a plastic injection molding corporation, in 1979. Defendant's father, Robert Dennis Weaver, Sr. (Dennis Weaver), was R&D's sole owner and CEO, while defendant's mother, Shirley Weaver, served as R&D's secretary-treasurer. In 1997 and 1998, defendant was employed at R&D as the plant manager and all R&D employees reported to him, with the exception of his parents and one other individual.

In 1996, defendant, his father Dennis Weaver, and two other individuals acquired International Color, a color compounding plant for plastic material. International Color was then relocated near the R&D site and treated by the Weavers as an extension of R&D.

Defendant married Kimberly Weaver, who was employed as a receptionist at R&D in 1986. In 1997 and 1998, when the misappropriation occurred, Kimberly Weaver was an employee of both R&D and International Color and was being trained by Shirley Weaver to become the accounting manager. Kimberly Weaver's duties at R&D included entering payables, making bank deposits, and entering data. Kimberly Weaver also "ran" the International Color office.

With respect to her duties, responsibilities, and authority at R&D, Kimberly Weaver testified:

> Normally I would write a check if we had a COD delivery come in. Or if we had something that we had to go pick up and we needed to pay for, I would call Shirley and ask her if it was all right if I ran a check, and she would authorize it, and I would run the check and use her stamp.

Both Shirley and Kimberly Weaver testified at defendant's trial that Kimberly had no authority to sign R&D or International Color checks. Kimberly Weaver testified that in order to write a check from either company's account she "had to have direct permission from either Shirley, and if Shirley was not available, Dennis Weaver." Shirley Weaver further testified that, except on a case-by-case basis, Kimberly did not have the authority to use the signature stamp, which was kept in a desk drawer in Shirley's office.

During 1997 and 1998, Kimberly Weaver and defendant were experiencing personal financial difficulty. According to Kimberly

Weaver, defendant began directing her to misappropriate R&D funds to solve their financial problems. At defendant's trial, Kimberly Weaver testified:

> [Defendant] came to me and said, "Let's"—There was something that needed to be done or he wanted done on the home, and the credit cards were to their maximum limit, and we did not have the funds to do whichever, I can't remember specifically, and he told me to borrow the money from R&D Plastics. And when I questioned him how, he said, "Well, just go upstairs and take the stamp out of Mom's drawer and just stamp the check and put it into Technicraft."

From January of 1997 through May of 1998, Kimberly Weaver misappropriated over $450,000 from R&D and International Color. She accomplished this by using counter checks, checks earmarked for shredding because they listed R&D's address incorrectly, or legitimate corporate checks. Kimberly Weaver would write the checks and then stamp them with Shirley Weaver's signature. According to Kimberly Weaver, the misappropriated funds were used by defendant or herself for various personal expenses, including credit card bills, household expenses such as electricity bills, season tickets to Alabama football games, hunting dog purchases and training, hunting and deep-sea fishing trips, various home improvements and landscaping, home furnishings and appliances, family vacations, and expenses incurred in buying or showing horses.

Kimberly Weaver testified at trial that defendant manipulated inventory records in an effort to cloak her activities. She further concealed her illegal activity by under-reporting deposits in company records, thereby misrepresenting R&D's actual cash inflow. Additionally, Kimberly Weaver wrote unauthorized checks from International Color to R&D to "make up a deficit in the deposit versus the checks that Shirley had run so we would not be overdrawn on the bank account."

It is undisputed that Kimberly Weaver also used a third company, Technicraft, Inc. (Technicraft), as a vehicle to conceal the misappropriation of R&D and International Color funds. Defendant founded Technicraft in 1996 to complete secondary work on plastic parts. Technicraft was physically located at the R&D plant site; however, its corporate records were kept on a computer at the home of defendant and Kimberly Weaver.

With respect to the discovery of Kimberly Weaver's illegal activities, Shirley Weaver testified that although she paid the company bills, Kimberly balanced the checkbook each month. Thus, Shirley Weaver testified:

> [As I started to pay the bills for the last pr]obably nine months, I knew that we had a problem with money. . . . We were making a good profit and should have had the cash there to pay the bills, and every week when I started to pay bills, the money wasn't there, it just wasn't there. And every week Kim would come up with a deposit that just didn't get recorded so that I could make the bills, but we still didn't have the money.

Shirley Weaver also testified that in December 1997 or January 1998, she and two R&D employees examined the company records to "make sure that Kim and [defendant] were not double or triple billing for the Technicraft things."

Shirley and Dennis Weaver first identified the breadth of accounting irregularities created by Kimberly Weaver on 29 May 1998. On that day, Shirley Weaver was notified that eleven International Color checks had been returned by the bank, stamped non-sufficient funds. When Shirley Weaver questioned Kimberly Weaver about the checks, Kimberly became hysterical and left the International Color business office. Kimberly Weaver testified that she was so distraught that she later attempted suicide.

On 6 August 2001, a Buncombe County grand jury indicted defendant for two counts of aiding and abetting Kimberly Weaver to embezzle funds from International Color, nineteen counts of aiding and abetting Kimberly Weaver to embezzle funds from R&D, and a single count of conspiracy to commit embezzlement from International Color and R&D. Defendant was arraigned on 10 September 2001 and entered not guilty pleas to each charge. The record on appeal suggests that Kimberly Weaver was similarly charged or was expected to be similarly charged; however, at defendant's trial Kimberly Weaver testified that she had no pending plea bargain with the District Attorney's Office in return for her cooperation and testimony. On 4 December 2001, a Buncombe County jury returned a verdict finding defendant guilty on all counts.

[1] This Court must now determine whether the funds Kimberly Weaver misappropriated from R&D and International Color were in her lawful possession or under her care and control such that defend-

ant's convictions of aiding and abetting embezzlement and conspiracy to embezzle may stand.

## HISTORY AND ELEMENTS OF THE LAW OF EMBEZZLEMENT

The crime of embezzlement developed as, and continues to be, an important statutory counterpart to the common law crime of larceny. At common law, if an employee acquired his employer's property by trespass, meaning that the employee took the property against his employer's will with the intent to steal it, the employee was guilty of larceny, a felony.[1] 2 Joel Prentiss Bishop, *New Commentaries on The Criminal Law Upon a New System of Legal Exposition* §§ 799, 803 (Chicago, T.H. Flood & Co., 8th ed. 1892) [hereinafter 2 Bishop, *New Commentaries* (1892)]; *see also* 2 William Oldnall Russell, *A Treatise on Crimes and Indictable Misdemeanors* 102 (Philadelphia, P.H. Nicklin & T. Johnson, 3d ed. 1836) [hereinafter 2 Russell, *Treatise on Crimes*]. If an employee lawfully came into possession of his employer's property during the course of employment, but later took that property for his own personal benefit, the employee was guilty of the common law offense of breach of trust, a misdemeanor.[2] 2 Bishop, *New Commentaries* §§ 799, 803 (1892); *see also State v. Braden*, 2 Tenn. 466, 467-68, 2 Overt. 68, 69-70 (1805); Jerome Hall, *Theft, Law and Society* 34-40 (2d ed. 1952) [hereinafter Hall, *Theft*]. This distinction, based upon the premise that there could be no larceny without trespass, generated a multitude of cases before the English courts. *See, e.g., Regina v. Creed*, 174 Eng. Rep. 714 (1843); *Rex v. Hart*, 172 Eng. Rep. 1166 (1833); *Cartwright v. Green*, 168 Eng. Rep. 574 (1803); *The King v. Pear*, 168 Eng. Rep. 208 (1780); *see also* 2 Russell, *Treatise on Crimes* 104 ("If, therefore, there be no trespass in taking goods, there can be no felony in carrying them away."). Notwithstanding early statutory attempts to eliminate this disparity in specific cases[3], difficult questions, similar to the question *sub judice,*

---

1. "A felony at common law was any crime which occasioned the forfeiture of lands and goods. This was usually accompanied by capital punishment, though not always; but, as capital punishment was usually inflicted, felonies came to include all crimes punishable by death." Wm. L. Clark, Jr., *Hand-Book of Criminal Law* 40 (Francis B. Tiffany ed., 2d ed. 1902) (footnotes omitted); *see also* 1 Joel Prentiss Bishop, *Commentaries on The Criminal Law* § 615 (Boston, Little, Brown, & Co., 6th ed. 1877).

2. " 'The word misdemeanor, in its usual acceptation, is applied to all those crimes and offences [sic] for which the law has not provided a particular name; and they may be punished, according to the degree of the offence [sic], by fine, or imprisonment, or both.' " Bishop, note 1, § 624 (citation omitted) (footnotes omitted).

3. *See* An Act to alter certain rates of postage, and to amend, explain, and enlarge several provisions in an act made in the ninth year of the reign of Queen Anne, and in

continued to arise regarding the relationship of parties to each other and to the stolen property.

The first "modern" embezzlement statute was enacted in England by Parliament in 1799. An Act to protect masters against embezzlements by their clerks or servants, 1799, 39 Geo. 3, c. 85 (Eng.); *see also* Hall, *Theft* 38-39. The purpose of the Act was to ensure uniform results in similar cases by extending the common law of larceny to most circumstances in which the defendant initially came to possess the stolen property without trespass. Wm. L. Clark, Jr., *Hand-Book of Criminal Law* 307-08 (Francis B. Tiffany ed., 2d ed. 1902) ("At common law, to constitute larceny, it is also necessary that the property be taken from the owner's possession by trespass, with intent to deprive him of his ownership; and therefore that crime is not committed by a bailee or other person who, after lawfully obtaining possession from the owner in good faith, appropriates it to his own use. It was to meet these cases that the embezzlement statutes were enacted."); 2 Bishop, *New Commentaries* § 800 (1892) ("It was to make punishable misappropriations without trespass that the embezzlement statutes were passed."). Although subsequent enactments of the English embezzlement statute expanded the class of persons deemed to be capable of embezzlement and the class of things capable of being embezzled, *see* An Act to make better Provision for the Punishment of Frauds committed by Trustees, Bankers, and other Persons intrusted with Property, 1857, 6 Geo. 4, c. 94 (Eng.); An Act for more effectually preventing the Embezzlement of Securities for Money and other Effects, left or deposited for safe Custody, or other special Purpose, in the Hands of Bankers, Merchants, Brokers, Attorn[ey]s or other Agents, 1812, 52 Geo. 3, c. 63 (Eng.), no subse-

---

other acts relating to the revenue of the post office, 1765, 5 Geo. 3, c. 25, § 17 (Eng.) (governing embezzlement by employees of the post office); An Act for reducing the interest upon the capital stock of the South Sea Company, from the time and upon the terms herein mentioned; and for preventing of frauds committed by the officers and servants of the said company, 1751, 24 Geo. 2, c. 11, § 3 (Eng.) (governing embezzlement by officers and servants of the South Sea Company); An Act for establishing an agreement with the governor and company of the Bank of England, for advancing the sum of one million six hundred thousand pounds, towards the supply for the service of the year one thousand seven hundred and forty two, 1742, 15 Geo. 2, c. 13, § 12 (Eng.) (governing embezzlement by officers and servants of the Bank of England); Servants [e]mbezzelling their masters' goods to the value of forty shilling[s], or above, shall be punished as felons, 1529, 21 Hen. 8, c. 7 (Eng.) (governing embezzlement by servants given enumerated property *to keep* on behalf of their master); *see also* Hall, *Theft* 39 (listing three specific embezzlement statutes enacted in England prior to 1799); 2 Joel Prentiss Bishop, *Commentaries on The Criminal Law* §§ 319, 320 (Boston, Little, Brown, & Co., 7th ed. 1882) (noting the narrow language of 21 Hen. 8, c. 7)

quent enactment vitiated the distinction that the embezzlement statute criminalized non-trespassory takings and larceny remained the proper action in all other cases. Embezzlement remained a purely statutory offense, specifically tailored to criminalize as felonies acts which common law larceny did not govern.

In post-colonial North Carolina, the new state's common law and statutory traditions can be traced to its origin in English law. Because North Carolina's legal system was still in its infancy when North Carolina became the twelfth state on 21 November 1789, it is not surprising that the British common law crime of larceny and statutory crime of embezzlement were discussed by this Court in one of its first reported decisions, *State v. Higgins*, 1 N.C. 36, 1 Mart. 62 (1792) (vacating judgment of guilt under 21 Hen. 8, c. 7 because defendant was not a "servant" under that statute and because the acts charged, which did not include felonious taking, did not constitute larceny at common law).

As North Carolina's legal system matured, the first statute criminalizing embezzlement was enacted during the 1871-1872 session of the General Assembly. That legislation, titled "An Act to Define and Punish the Crime of Embezzlement," stated:

> If any officer, agent, clerk or servant of any corporation, or any clerk, agent or servant of any person or co-partnership, (except apprentices and other persons under the age of sixteen years,) shall embezzle or fraudulently convert to his own use or shall take, make away with or secrete, with intent to embezzle or fraudulently convert to his own use any money, goods, or other chattels, bank note, check or order for the payment of money . . . which shall have come into *his possession or under his care by virtue of such office or employment*, he shall be deemed guilty of felony, and upon conviction thereof, shall be punished as in cases of larceny.

Act of Feb. 8, 1872, ch. 145, 1871-72 N.C. Sess. Laws 223, 223-24 (emphasis added).

Minor substantive revisions to the statute have been made over the last 130 years, most notably those expanding the class of individuals who are capable of committing the offense of embezzlement. Act of Feb. 25, 1889, ch. 226, 1889 N.C. Sess. Laws 237 (adding consignees); Act of Feb. 28, 1891, ch. 188, 1891 N.C. Sess. Laws 164 (including "public officer[s], clerk[s] of the superior or other court,

sheriff[s] or other person[s] or officer[s] exercising a public trust or holding public office"); Act of Feb. 6, 1897, ch. 31, 1897 N.C. Sess. Laws 83 (extending the statute to guardians, administrators, and executors who misappropriate funds); Act of Mar. 21, 1931, ch. 158, 1931 N.C. Sess. Laws 221 (further extending the statute to trustees who embezzle from their beneficiaries); Act of Jan. 24, 1939, ch. 1, 1939 N.C. Sess. Laws 25 (incorporating any receiver and any other fiduciary under the statutory scheme); Act of Feb. 17, 1941, ch. 31, 1941 N.C. Sess. Laws 41 (adding bailees to the list of individuals subject to the statute); Act of June 20, 1967, ch. 819, 1967 N.C. Sess. Laws 1044 (broadening the statutory scope to cover embezzlement from any unincorporated association or organization); *see also State v. Ross*, 272 N.C. 67, 69-72, 157 S.E.2d 712, 713-15 (1967) (discussing and interpreting the 1939-1967 expansions in the embezzlement law); *State v. Whitehurst*, 212 N.C. 300, 302-03, 193 S.E. 657, 659 (1937) (detailing the evolution of the embezzlement statute from 1872 through 1937); George P. Fletcher, *The Metamorphosis of Larceny*, 89 Harv. L. Rev. 469, 471 (1976) ("Embezzlement has grown from an offense applicable to selected relationships of trust to a general offense applicable to everyone who has been entrusted with property . . . ." (footnotes omitted)).

As a result, N.C.G.S. § 14-90, the current statute defining embezzlement, now states:

> If any person exercising a public trust or holding a public office, or any guardian, administrator, executor, trustee, or any receiver, or any other fiduciary, or any officer or agent of a corporation, or any agent, consignee, clerk, bailee or servant, except persons under the age of 16 years, of any person, shall embezzle or fraudulently or knowingly and willfully misapply or convert to his own use, or shall take, make away with or secrete, with intent to embezzle or fraudulently or knowingly and willfully misapply or convert to his own use any money, goods or other chattels, bank note, check or order for the payment of money . . . belonging to any other person or corporation, unincorporated association or organization which shall have come into *his possession or under his care*, he shall be guilty of a felony.

N.C.G.S. § 14-90 (2003) (emphasis added).

Over the past century, this Court has examined embezzlement and its place in our jurisprudence on several occasions. For example, in a 1903 decision, this Court noted that the general aim of embezzle-

ment statutes in both England and North Carolina "was to *punish the misappropriation of property rightfully in the possession of the alleged wrongdoer*, who, though civilly liable for a conversion, could not be convicted of larceny, because there was no taking from the owner's possession by an act of trespass." *State v. McDonald*, 133 N.C. 680, 683, 45 S.E. 582, 583 (1903) (emphasis added).

More recently in *State v. Griffin*, 239 N.C. 41, 79 S.E.2d 230 (1953), this Court distinguished embezzlement from larceny, stating:

> While there is similarity in some respects between larceny and embezzlement, they are distinct offenses. Larceny is a common law offense not defined by statute; while embezzlement is a criminal offense created by statute to cover fraudulent acts which did not contain all the elements of larceny.
>
> Generally speaking, to constitute larceny there must be a wrongful taking and carrying away of the personal property of another without his consent, and this must be done with felonious intent . . . . The embezzlement statute makes criminal the fraudulent conversion of personal property by one occupying some position of trust or some fiduciary relationship as specified in the statute. The person accused must have been entrusted with and *received into his possession lawfully* the personal property of another, and thereafter with felonious intent must have fraudulently converted the property to his own use. Trespass is not a necessary element. *In embezzlement the possession of the property is acquired lawfully by virtue of the fiduciary relationship and thereafter the felonious intent and fraudulent conversion enter in to make the act of appropriation a crime* (citations omitted).[4]

---

4. After being charged with both larceny and embezzlement for the same transaction, the defendant in *State v. Griffin* moved that the prosecutor be required to elect the offense for which he should be tried. No election occurred, and defendant was found guilty of both offenses; however, the sentences imposed for both crimes ran concurrently, and this Court thus stated that "it would appear that the defendant has no cause for complaint that the court did not require an election." 239 N.C. at 46, 79 S.E. 2d at 233. Nonetheless, we also stated in *Griffin* that "we think the defendant's motion that the solicitor be required to elect whether the defendant [would be] put to trial for larceny or embezzlement should have been allowed." *Id.* at 45, 79 S.E.2d at 233. As we later noted in *State v. Speckman*, 326 N.C. 576, 391 S.E.2d 165 (1990), since *Griffin* was decided, the General Assembly has abrogated the election requirement as applied in that case. *Id.* at 579, 391 S.E.2d at 167 (citing a 1975 amendment to N.C.G.S. § 14-100, defining the felony of obtaining property by false pretenses). Even though the portion of *Griffin* relating to election of charges is no longer valid, we believe *Griffin* remains an accurate statement of the distinction between the crimes of larceny and embezzlement.

*Id.* at 44-45, 79 S.E.2d at 232-33 (emphasis added); *see also State v. Speckman,* 326 N.C. 576, 391 S.E.2d 165 (1990) (discussing and applying *Griffin*); *State v. Whitley,* 208 N.C. 661, 663, 182 S.E. 338, 340 (1935) (holding that the simple fact that the accused is an employee of the victim does not transform the crime from larceny to embezzlement, as the key distinction between the two crimes is lawful possession).

Historically, since the General Assembly codified the criminal offense of embezzlement in North Carolina, the criminal act has hinged on a defendant's misappropriation of property in his/her lawful possession or care due to employment or fiduciary capacity. As in English common law, misappropriation by trespass supports the offense of larceny, not embezzlement, in North Carolina. *Griffin,* 239 N.C. at 44-45, 79 S.E.2d at 232-33. Therefore, North Carolina courts have remained respectful of the separate and distinct nature of these crimes and restrained in their application of N.C.G.S. § 14-90. For the reasons discussed below, we decline to adapt N.C.G.S. § 14-90 to the facts *sub judice.*

## APPLICATION OF THE LAW OF EMBEZZLEMENT
## TO THE PRESENT CASE

In the instant case, it is undisputed that Kimberly Weaver had no independent authority to write checks from R&D accounts or to use Shirley Weaver's signature stamp. In fact, both Kimberly and Shirley Weaver testified that direct authorization from Shirley was required before Kimberly wrote each individual check. Although the record is unclear as to the exact location of each check used to misappropriate the company funds, the record indicates that the signature stamp was kept in a desk drawer in Shirley Weaver's office and that Kimberly Weaver could not access this stamp without Shirley Weaver's direct permission. While Kimberly Weaver had *access* to the checks and signature stamp by virtue of her status as an employee at R&D and International Color, we cannot say, based on these facts, that Kimberly Weaver's possession of this property was *lawful* nor are we persuaded that this property was under Kimberly Weaver's care and control as required by N.C.G.S. § 14-90. Because Kimberly Weaver never lawfully "possessed" the misappropriated funds and because the funds were not "under [her] care" we conclude that Kimberly Weaver did not commit the crime of embezzlement as defined in N.C.G.S. § 14-90.

" 'It is a rule of universal observance in the administration of criminal law that a defendant must be convicted, if convicted at all, of the particular offense charged in the bill of indictment. The allegation and proof must correspond.' " *State v. Watson*, 272 N.C. 526, 527, 158 S.E.2d 334, 335 (1968) (quoting *State v. Jackson*, 218 N.C. 373, 376, 11 S.E.2d 149, 151 (1940)). Here, defendant was indicted for two counts of aiding and abetting Kimberly Weaver to embezzle funds from International Color, nineteen counts of aiding and abetting Kimberly Weaver to embezzle funds from R&D, and a single count of conspiracy to commit embezzlement from International Color and R&D. Accordingly, the evidence presented by the State at trial must establish that Kimberly Weaver committed the crime of embezzlement to support defendant's convictions on these indictments. However, the State did not prove, and in actuality cannot establish, that Kimberly Weaver embezzled funds from these companies. Kimberly Weaver unlawfully used Shirley Weaver's signature stamp to come into possession of R&D and International Color funds; therefore, the facts appear to support the crime of larceny rather than embezzlement. Accordingly, the appropriate charges against defendant should have been aiding and abetting larceny and conspiracy to commit larceny. Because the State cannot make the "allegation[s] and proof correspond," the majority opinion of the Court of Appeals must be affirmed.

The State sets forth two main arguments in support of its position on appeal. First, the State argues that Kimberly Weaver was an agent of R&D Plastics and International Color; therefore, she gained access to the misappropriated funds lawfully. Second, the State argues that Kimberly Weaver "possessed" the currency she later embezzled and that the majority of the Court of Appeals' panel erred in "center[ing] on Kimberly Weaver's check writing authority rather than the dominion and control she had over the U.S. currency." We find both arguments unpersuasive for the reasons stated below.

The State primarily relies on *State v. Johnson*, 335 N.C. 509, 438 S.E.2d 722 (1994) to establish that Kimberly Weaver was her employer's agent. However, we find *Johnson* totally inapposite to the instant case. In *Johnson*, an attorney was hired for the express purpose of recovering money for damages his client incurred in an automobile accident. 335 N.C. at 510, 438 S.E.2d at 722. Thus, as we stated in *Johnson*, "The defendant was the agent of [his client] with authority to negotiate the settlement of her claim." *Id.* at 511, 438 S.E.2d at 723. The defendant subsequently negotiated and accepted a payment

from the liability carrier on his client's behalf. Although defendant told the adjuster that his client would accept the payment as full compensation for her injuries, defendant never informed his client that he had negotiated a settlement or received the draft transferring the funds. *Id.* at 510, 438 S.E.2d at 722. Subsequently, defendant or someone in his law office forged the client's signature on the required paperwork, and defendant deposited the money in his personal account. *Id.* Defendant was later convicted of embezzlement. *Id.* The Court of Appeals reversed the judgment, and this Court reversed and remanded the case to the trial court for reinstatement of the sentence. 335 N.C. at 512, 438 S.E.2d at 723.

*Johnson* has no bearing on the present case. In *Johnson* there was no dispute that defendant was his client's agent for purposes of negotiating a settlement and obtaining payment in compensation for his client's injuries. In his capacity as an attorney representing his client, defendant acquired the insurance proceeds meant for his client in a lawful manner. Thus, he was properly charged with embezzlement when he later misappropriated those funds.

In contrast, Kimberly Weaver does not meet the legal definition of an agent. Two essential elements of an agency relationship are: (1) the authority of the agent to act on behalf of the principal, and (2) the principal's control over the agent. *Holcomb v. Colonial Assocs.*, 358 N.C. 501, 509, 597 S.E.2d 710, 716 (2004). Additionally, both parties must consent that the agent will act on behalf of the principal in a particular capacity. *Ellison v. Hunsinger*, 237 N.C. 619, 628, 75 S.E.2d 884, 891 (1953). Agency is a relationship "which cannot be forced on a person *in invitum.*" *Johnson v. Orrell*, 231 N.C. 197, 201, 56 S.E.2d 414, 417 (1949).

As stated above, it is undisputed that Kimberly Weaver *did not have authority* to take the signature stamp or to write any check without specific permission from Shirley Weaver. The State's reliance on Kimberly Weaver's ongoing training to become accounting manager and "the fact that Kimberly Weaver was her supervisor's 'best friend' " is insufficient to overcome this dispositive fact. Unlike the defendant in *Johnson*, Kimberly Weaver was not her employer's agent and she never lawfully possessed the misappropriated funds, initially or otherwise. Therefore, *Johnson* does not support the State's argument that Kimberly Weaver embezzled the misappropriated funds.

We now address the State's argument to the effect that the Court of Appeals' majority erred in "center[ing] on Kimberly Weaver's

check-writing authority rather than the dominion and control she had over the U.S. currency." This argument seeks to support the elements of embezzlement which require that the person who misapplied the funds have "received," and thus come into possession of, the employer's property "by the terms of his employment" and "in the course of his employment." As possession of property can be actual or constructive, the Court of Appeals' majority considered whether possession could be supported on either theory, noting that:

> The State correctly cites the rule that possession of property may be actual or constructive. However, "[a]lthough defendant's possession of the entrusted property may be actual or constructive, even constructive possession of property requires 'an intent and capability to maintain control and dominion' over it.[]"

*Weaver*, 160 N.C. App. at 619, 586 S.E.2d at 844-45 (quoting *State v. Jackson*, 57 N.C. App. 71, 76, 291 S.E.2d 190, 194, *disc. rev. denied*, 306 N.C. 389, 294 S.E.2d 216 (1982)), *quoted in State v. Bonner*, 91 N.C. App. 424, 426, 371 S.E.2d 773, 775 (alterations in original) (citations omitted).

The State's argument fails because it is immaterial whether Kimberly Weaver had actual or constructive possession of the misappropriated funds. Because her possession, if any, was not lawful, the crime of embezzlement has not occurred. *See Speckman*, 326 N.C. at 578, 391 S.E.2d at 166 ("This Court has held that to constitute embezzlement, the property in question initially must be acquired lawfully, pursuant to a trust relationship, and then wrongfully converted.").

For the foregoing reasons, we conclude that the evidence presented at trial does not support defendant's conviction for the crime of embezzlement. Accordingly, the decision of the Court of Appeals is affirmed as to the issue on direct appeal. Defendant's convictions for aiding and abetting embezzlement and conspiracy to embezzle are reversed.

[2] Defendant also petitioned this Court pursuant to N.C.G.S. § 7A-32(b) for a writ of certiorari to review additional issues which were briefed and argued before the Court of Appeals but were not resolved in its opinion. We allowed certiorari on 5 February 2004; however, we now conclude that certiorari was improvidently allowed. Therefore, the decision of the Court of Appeals is affirmed.

AFFIRMED; WRIT OF CERTIORARI IMPROVIDENTLY ALLOWED.

Justice NEWBY did not participate in the consideration or deci-
sion of this case.