TYSON, Judge.
 

 *719
 
 Keyshawn Jones ("Defendant") appeals from judgment entered after a jury found him guilty of three counts of felony larceny. We vacate Defendant's convictions.
 

 I. Background
 

 In 2010, Defendant was working as a commercial truck driver. Defendant hired Scott Huebner ("Huebner") as his agent. The two men never met in person, but would communicate through e-mails, phone calls, and text messages. Under their arrangement, Defendant drove the routes and managed the loading and unloading of pickups and deliveries, while Huebner managed the office work.
 

 *335
 

 *720
 
 After working together for approximately one and a half years, Huebner began to contract primarily with EF Corporation, d/b/a WEST Motor Freight of PA ("WEST Motor Freight"). Like many commercial transit companies, WEST Motor Freight contracts with agencies, who in turn contract with individual drivers to transport and deliver payloads. Shortly after Huebner made this transition, Defendant began driving exclusively for WEST Motor Freight through Huebner.
 

 Sherry Hojecki ("Hojecki") was in charge of the billing and settlement department for WEST Motor Freight. Hojecki was responsible for managing payments to drivers, dubbed "settlements" because drivers are independent contractors rather than employees.
 

 Some drivers, including Defendant, would receive advance payments, which would be received in one of three common ways: (1) through a "Comdata card," a prepaid corporate debit card; (2) through an advance added to a regular settlement payment; or, (3) through a "maintenance account." Hojecki testified that money held in a driver's maintenance account "belongs to the driver."
 

 To pay drivers, Hojecki uses a specialized computer system to create a settlement statement. This statement lists the amount of money to be paid to a driver. The statement is uploaded into WEST Motor Freight's accounts payable system, and Hojecki transmits the actual payment.
 

 On or about 10 July 2012, Huebner contacted Hojecki on Defendant's behalf to inquire about the amount of money held in Defendant's maintenance account. Hojecki told Huebner there was approximately $1,200 in the account. Huebner requested $1,200 be deposited in Defendant's bank account, via direct deposit. Hojecki created a settlement statement for the payment, uploaded it into the accounting system, processed the direct deposit, and sent the transaction to the appropriate bank for deposit into Defendant's bank account.
 

 The morning after conducting this transaction, Hojecki prepared a physical copy of the driver settlement report, which outlined the direct deposit she had made the previous day. The physical copy was to be mailed to Defendant.
 

 While preparing the mailing, Hojecki realized she had keyed in an extra two zeros on Defendant's settlement statement, which resulted in a $120,000.00 payment being made to Defendant's account, rather than $1,200.00. After various deductions and fees, $118,729.49 was deposited into Defendant's bank account. Hojecki testified the money errantly deposited above the amount in Defendant's maintenance account into Defendant's bank account belonged to WEST Motor Freight.
 

 *721
 
 After realizing the error, Hojecki alerted her superior. Consistent with her superior's directives, she filled out a report, requested the transaction be stopped, and sent it to the bank. Hojecki later learned the bank was unable to stop the transaction, and the money had been deposited into Defendant's bank account. Hojecki contacted Huebner and requested he contact Defendant to inform him a mistake had been made and the transaction was being reversed.
 

 After speaking with Hojecki, Huebner called Defendant on 12 July 2012 to "find out what needed to be done to make sure everything went the way it needed to." Huebner testified he called Defendant and told him a "transfer that was coming in was going to be ... for the wrong amount, and a reversal was put through, and that [Defendant] needed to make sure that his bank account remained positive so there were no issues." Huebner elaborated:
 

 Once I told him that the transfer would come in and immediately reverse we did talk about the amount that would come in[.] ... He did say that he'd be more than willing to take that amount and then work it off over time, which I told him would probably not be accepted by [WEST Motor Freight].... I did tell him that if the bank account was negative and the reversal didn't come through, that would be a problem, so make sure not to touch the money.... [Defendant] said that if the money didn't come out he would just go ahead and write a check to [WEST Motor Freight] to give it back to them.
 

 *336
 
 The next day, Huebner again contacted Defendant and inquired about the payment and the reversal. Huebner testified Defendant told him that his account had the "exact amount in it that it was supposed to have," so the reversal must have been completed.
 

 Huebner, Defendant's agent, received notice from Hojecki that the transaction was not able to be reversed. Following a series of conversations, Defendant eventually informed Huebner he had filed for bankruptcy and the bankruptcy courts must have taken the erroneously transferred money. Huebner testified Defendant affirmatively stated he did not write any checks or transfer any money out of the account, after receiving Huebner's phone call about the excess transfer.
 

 Donna Oldham ("Oldham"), a Vice President and City Officer at the North Carolina State Employees' Credit Union ("SECU"), was in charge of the day-to-day operations of the West Ash Street branch of SECU in Goldsboro, North Carolina. Oldham testified that on 15 July 2012,
 
 *722
 
 Defendant performed seven separate ATM cash withdraws of $1,000 each at a SECU ATM.
 

 Oldham testified in addition to the seven ATM cash withdraws, Defendant performed two "internet transfers," of $10,000.00 each, from his checking and into a savings account belonging to Defendant. Both of these transactions occurred on 15 July 2012.
 

 Terry Pridgen ("Pridgen"), a financial services representative with SECU, also worked at the West Ash Street SECU branch in Goldsboro. She was tasked with, among other duties, assisting members perform checking deposits and withdrawals. Pridgen testified Defendant came into the West Ash Street branch on 16 July 2012 to perform several withdrawals from his account.
 

 Pridgen noticed there was a recent large deposit into the account, so she asked Defendant why such a large sum was deposited into his account. Pridgen testified Defendant stated he "was in business with someone else, and that he had sold his part out, so they directly deposited the money to him for his part of the business."
 

 Defendant performed several transactions on 16 July 2012. Defendant purchased a cashier's check payable to "Robert Browning, Chapter 13" in the amount of $21,117.80, and a second cashier's check payable to Marshall Coleman in the amount of $2,000.00. Defendant also withdrew $66,744.00 and $10,988.00 in two separate transactions, and used that money to purchase a third cashier's check, payable to himself, in the amount of $67,732.00. Finally, Defendant deposited $5,000.00 each into two accounts, belonging to Shaquida Lane and Sadie Jones, respectively.
 

 On 23 July 2012, Defendant took the $67,732.00 cashier's check into a SECU branch on Wayne Memorial Drive in Goldsboro, where SECU senior teller Dianne Stewart ("Stewart") assisted him. Defendant advised Stewart he wished to deposit $60,000.00 into an account held by Shaquida Lane, and the remainder to be given to him in cash. Stewart assisted Defendant in completing the transactions.
 

 On 1 April 2013, Defendant was indicted with three counts of larceny and three counts of possession of stolen goods. The indictment alleged Defendant stole and possessed U.S. currency, the property of WEST Motor Freight, in the amounts of $7,000.00, $20,000.00, and $89,861.80 respectively. The case proceeded to trial on 27 October 2014. At the close of State's evidence, the State moved to dismiss the three counts of possession of stolen property, which was granted.
 

 *723
 
 Defendant then made a motion to dismiss the remaining three counts of larceny based on insufficiency of the evidence. After considering the arguments of counsel, the trial court denied the motion. On 31 July 2014, the jury returned a verdict and found Defendant to be guilty of three counts of larceny.
 

 Defendant gave notice of appeal in open court.
 

 II. Issue
 

 In Defendant's sole argument, he contends the trial court erred in denying his motion to dismiss for insufficiency of the evidence.
 

 III. Defendant's Motion to Dismiss
 

 Defendant asserts his motion to dismiss should have been granted, because the State
 
 *337
 
 failed to present substantial evidence of each essential element of the crimes alleged. We agree.
 

 A. Standard of Review
 

 This Court reviews the denial of a motion to dismiss in a criminal trial
 
 de novo.
 

 State v. Smith,
 

 186 N.C.App. 57
 
 , 62,
 
 650 S.E.2d 29
 
 , 33 (2007) (citation omitted). Upon a defendant's motion to dismiss due to insufficient evidence, "the question for the Court is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense. If so, the motion is properly denied."
 
 State v. Fritsch,
 

 351 N.C. 373
 
 , 378,
 
 526 S.E.2d 451
 
 , 455 (2000) (citation omitted).
 

 "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."
 
 State v. Nicholson,
 

 355 N.C. 1
 
 , 51,
 
 558 S.E.2d 109
 
 , 143 (2002) (citations omitted). All evidence, both competent and incompetent, and any reasonable inferences drawn therefrom, must be considered in the light most favorable to the State.
 
 State v. Rose,
 

 339 N.C. 172
 
 , 192-93,
 
 451 S.E.2d 211
 
 , 223 (1994),
 
 cert. denied,
 

 515 U.S. 1135
 
 ,
 
 115 S.Ct. 2565
 
 ,
 
 132 L.Ed.2d 818
 
 (1995).
 

 Additionally, circumstantial evidence may be sufficient for the State to withstand a motion to dismiss when "a reasonable inference of defendant's guilt may be drawn from the circumstances."
 
 Fritsch,
 

 351 N.C. at 379
 
 ,
 
 526 S.E.2d at 455
 
 (citations and quotations omitted). If so, it is the jury's role and duty to determine whether the defendant is actually guilty.
 

 Id.
 

 *724
 

 B. Analysis
 

 Defendant argues the State failed to provide substantial evidence of each essential element of the crime of larceny. He contends that because Hojecki, on behalf of WEST Motor Freight, deposited the $118,729.49 into his bank account willingly, the essential element of a trespass is lacking. We agree.
 

 "The essential elements of felony larceny are that the defendant: (1) took the property of another; (2) carried it away; (3) without the owner's consent; and (4) with the intent to deprive the owner of his property permanently."
 
 State v. Perry,
 

 305 N.C. 225
 
 , 233,
 
 287 S.E.2d 810
 
 , 815 (1982),
 
 overruled in part on other grounds by
 

 State v. Barnes,
 

 324 N.C. 539
 
 , 540,
 
 380 S.E.2d 118
 
 , 119 (1989). By statute, larceny of goods of the value of more than one thousand dollars ($1,000) is a Class H felony. N.C. Gen.Stat. § 14-72(a) (2013).
 

 1. Actual Trespass
 

 Our Supreme Court has stated the taking of the property of another "involves a trespass either actual or constructive."
 
 State v. Bowers,
 

 273 N.C. 652
 
 , 655,
 
 161 S.E.2d 11
 
 , 14 (1968). "The taker must have had the intent to steal at the time he unlawfully takes the property from the owner's possession by an act of trespass."
 

 Id.
 

 "[T]o constitute a larceny, the
 
 taking
 
 must be such as amounts to a
 
 trespass.
 
 Every larceny includes a trespass; and if there be no trespass in taking the goods, there can be no felony committed in carrying them away."
 
 State v. Webb,
 

 87 N.C. 558
 
 , 559 (1882) (emphasis in original) (citation omitted).
 

 An actual trespass occurs when a defendant "unlawfully takes the property from the owner's possession by an act of trespass."
 
 Bowers,
 

 273 N.C. at 655
 
 ,
 
 161 S.E.2d at 14
 
 . In this case, Defendant did not take the $118,729.49 from WEST Motor Freight's possession by an act of actual trespass. The money was removed from WEST Motor Freight's bank account and was deposited by Hojecki (WEST Motor Freight's employee) into Defendant's bank account without any actual action taken by Defendant.
 

 2. Constructive Trespass
 

 Unlike an actual trespass, a "constructive trespass" occurs "when possession of the property is fraudulently obtained by some trick or artifice."
 

 Id.
 

 In this case, there was no "trick" or "artifice," which allowed Defendant to fraudulently obtain possession of the money deposited into his account. As noted
 
 supra,
 
 the money was
 
 *338
 
 deposited into Defendant's bank account by WEST Motor Freight, through Hojecki. Defendant did
 
 *725
 
 not trick WEST Motor Freight to deposit extra money into his account; rather, the money was deposited by mistake, and the mistake in the correct amount to be deposited was WEST Motor Freight's, not Defendant's.
 

 The State argues the taking did not occur when Hojecki deposited the $118,729.49 into Defendant's account, but rather the taking occurred after Defendant had been made aware of the erroneous transfer and, subsequent to that knowledge, took control of those funds, moved, and used them for his own purposes. We disagree.
 

 The State's interpretation would require WEST Motor Freight to be in constructive possession of the $118,729.49 it erroneously deposited into Defendant's bank account, such that Defendant constructively trespassed upon that possession by "taking control" of the money deposited into his own bank account. Our Supreme Court has held that "constructive possession of property requires 'an intent and capability to maintain control and dominion' over it. [ ]"
 
 State v. Weaver,
 

 359 N.C. 246
 
 , 259,
 
 607 S.E.2d 599
 
 , 606-07 (2005) (citations omitted). Presuming WEST Motor Freight intended to maintain control and dominion over the money it volitionally deposited into Defendant's account, WEST Motor Freight retained no ability to maintain control and dominion. The evidence showed Hojecki attempted, but failed, to reverse the direct deposit transaction to recover possession and control of the funds.
 

 WEST Motor Freight relinquished possession of and control over the money at the time it was transferred into Defendant's account. It did not actually or constructively continue to possess the money once the transfer into Defendant's account was completed. Defendant came into lawful possession of the $118,729.49 in his account.
 

 "Generally one who lawfully acquired possession of the goods or money of another cannot commit larceny by feloniously converting them to his own use, for the reason that larceny, being a criminal trespass on the right of possession, ... cannot be committed by one who, being invested with that right, is consequently incapable of trespassing on it."
 
 State v. Bailey,
 

 25 N.C.App. 412
 
 , 416,
 
 213 S.E.2d 400
 
 , 402 (1975) (citation omitted). The State's argument is overruled.
 

 State v. Jones
 

 We agree with Defendant that this case is analogous to
 
 State v. Jones,
 

 177 N.C.App. 269
 
 ,
 
 628 S.E.2d 436
 
 ,
 
 disc. review denied,
 

 360 N.C. 580
 
 ,
 
 636 S.E.2d 190
 
 (2006). In
 
 Jones,
 
 the victim, Ora Evans, buried $13,400 in cash in her ailing mother's backyard. She was concerned it might be stolen by home healthcare workers.
 
 177 N.C.App. at 270
 
 ,
 
 628 S.E.2d at 437
 
 . The
 
 *726
 
 money was buried with a note declaring Evans and her son to be the owners of the money.
 

 Id.
 

 Evans' mother eventually died, and the house was rented to Karenna Jones ("the defendant").
 

 Id.
 

 Two years later, Evans remembered she had buried the $13,400.00, went to the house being rented to the defendant, and attempted to locate the buried money.
 

 Id.
 

 She was unable to do so before the defendant ordered Evans off the property.
 

 Id.
 

 After Evans left, the defendant "got curious" and dug in the backyard, eventually finding and spending the buried money.
 
 Id.
 
 at 270-71,
 
 628 S.E.2d at 438
 
 . The defendant was charged and convicted of felony larceny.
 
 Id.
 
 at 271,
 
 628 S.E.2d at 438
 
 .
 

 This Court noted the defendant was in lawful possession of the real property where the money was buried, and had a valid lease entitling her to "lawful possession of the real property and consequently, the money [Evans] buried in the real property."
 
 Id.
 
 at 272,
 
 628 S.E.2d at 439
 
 . The Court acknowledged that "[a]s noted by [the defendant], upon the facts presented in [that] case, 'the crime [she] may have committed' ... would [have been] conversion by a lessee."
 

 Id.
 

 The Court reversed the defendant's larceny conviction, holding "the defendant here did not trespass and thus did not commit felonious larceny."
 

 Id.
 

 The facts presented in
 
 Jones
 
 are common and related to the facts presented here. Like
 
 Jones,
 
 Defendant had lawful possession of his bank account and consequently, the money located in that bank account. While
 
 *339
 
 Defendant clearly knew the large sum had been erroneously deposited into his account by WEST Motor Freight, Defendant did not actually or constructively trespass on the property of another in making withdrawals and purchasing cashier's checks with the money deposited in his own bank account. Consequently, Defendant "did not trespass and thus did not commit felonious larceny."
 

 Id.
 

 As these three larceny convictions are the only issues before us, we express no opinion on what, if any, other crimes Defendant may have committed.
 

 IV. Conclusion
 

 The State failed to present any substantial evidence tending to show Defendant actually or constructively trespassed to take possession of the property of another, an essential element of the charge of larceny. The trial court erred in failing to grant Defendant's motion to dismiss the crimes of which Defendant was charged at the close of the State's evidence. Defendant's three larceny convictions are vacated.
 

 VACATED.
 

 Judges STROUD and DIETZ concur.