IN THE SUPREME COURT OF NORTH CAROLINA

No. 27PA16

Filed 9 June 2017

STATE OF NORTH CAROLINA

v.

KEYSHAWN JONES

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, ___ N.C. App. ___, 781 S.E.2d 333 (2016), vacating defendant's convictions after appeal from a judgment entered on 29 October 2014 by Judge Kenneth F. Crow in Superior Court, Wayne County. Heard in the Supreme Court on 14 February 2017.

> *Joshua H. Stein, Attorney General, by Robert C. Montgomery, Senior Deputy Attorney General, and Derrick C. Mertz, Special Deputy Attorney General, for the State-appellant.*
>
> *Glenn Gerding, Appellate Defender, by John F. Carella, Assistant Appellate Defender, for defendant-appellee.*

MARTIN, Chief Justice.

In this case, defendant was overpaid because a payroll processor accidentally typed "$120,000" instead of "$1,200" into a payment processing system, resulting in a total payment (after deductions) of $118,729.49. Although defendant was informed of the error and was asked not to remove the excess funds from his bank account, he made a series of withdrawals and transfers totaling $116,861.80. We must decide

whether the State produced sufficient evidence to support defendant's convictions for three counts of felonious larceny.

When the overpayment occurred, defendant Keyshawn Jones[1] was a truck driver who worked as an independent contractor. At that time, he was driving trucks for EF Corporation, which was doing business as WEST Motor Freight (West). West gave its drivers the option to have money withheld every payroll period and placed in a "maintenance account" for the driver. Defendant participated in the maintenance account program and, in July 2012, requested $1,200 from his maintenance account.

But Sherry Hojecki, West's payroll processor, made an error while trying to type in the $1,200 payment, accidentally typing in "$120,000" instead. The final statement indicated that, after payroll deductions, defendant was to be given $118,729.49. Hojecki sent a report to M&T Bank, the bank that held West's funds, directing that this $118,729.49 figure be paid by direct deposit to defendant's account.

The next morning, Hojecki realized her error and tried to stop the transaction. She also told defendant, through his agent, about the error and requested that defendant not withdraw or transfer the excess funds from his account. The stop transaction did not succeed, however, and the deposit went through. As a result,

---

[1] Defendant states in his brief that the correct spelling of his first name is "Keyshaun," not "Keyshawn." Because the trial court's judgment used the spelling "Keyshawn," however, that is what we use here.

$118,729.49 was deposited in defendant's State Employees' Credit Union (SECU) account. West promptly tried to initiate a reversal of the deposit.

Despite West's instructions, defendant made several withdrawals and transfers that removed almost all of the excess funds from his account. Three days after being asked not to withdraw the funds, defendant made seven ATM cash withdrawals of $1,000 each, totaling $7,000. He also electronically transferred $20,000 from his checking account to his savings account. The next day, defendant went to one of SECU's branch locations to withdraw more of the money. The teller who assisted him noticed the deposit of $118,729.49 and asked defendant why such a large amount of money had been deposited into his account. Defendant replied that he was in business with someone else and had sold his part of the business. Defendant requested two cashier's checks in the amounts of $21,117.80 and $2,000. He also withdrew $66,744 from his checking account and used a portion of that amount to purchase a third cashier's check. These three withdrawals totaled $89,861.80. Because defendant had withdrawn or transferred virtually all of the money in question, the reversal that West had tried to initiate was not successful.

Defendant was later indicted for three counts of larceny and three counts of possession of stolen goods. The three larceny counts each charged defendant with "tak[ing] and carry[ing] away" a discrete amount of money from West—specifically, with taking and carrying away $7,000, $20,000, and $89,861.80, respectively. At the close of the State's evidence, the State made a motion to dismiss the three possession-

of-stolen-goods counts, which the trial court granted. After the trial court ruled on the State's motion, defendant moved to dismiss the remaining charges based on insufficiency of the evidence. The trial court denied defendant's motion. Defendant renewed his motion at the close of all evidence, and the trial court again denied defendant's motion. The jury found defendant guilty of all three counts of larceny. Defendant appealed to the Court of Appeals, and the Court of Appeals vacated defendant's convictions, finding that he had not committed a trespassory taking. *State v. Jones*, ___ N.C. App. ___, ___, 781 S.E.2d 333, 339 (2016). The State petitioned this Court for discretionary review, and we allowed the State's petition.

The question before us is whether the State presented sufficient evidence of felonious larceny. A defendant is guilty of larceny if the State proves that he "(a) took the property of another; (b) carried it away; (c) without the owner's consent; and (d) with the intent to deprive the owner of his property permanently." *State v. White*, 322 N.C. 506, 518, 369 S.E.2d 813, 819 (1988) (citing *State v. Perry*, 305 N.C. 225, 233, 287 S.E.2d 810, 815 (1982), *overruled on other grounds by State v. Mumford*, 364 N.C. 394, 699 S.E.2d 911 (2010)). "To survive a motion to dismiss for insufficient evidence, the State must present 'substantial evidence of all the material elements of the offense charged and that the defendant was the perpetrator of the offense.'" *State v. Campbell*, 368 N.C. 83, 87, 772 S.E.2d 440, 444 (2015) (quoting *State v. Myrick*, 306 N.C. 110, 113-14, 291 S.E.2d 577, 579 (1982)). Whether the evidence that the State presented at trial was substantial "is a question of law for the court." *State v. Barnes*,

345 N.C. 146, 148, 478 S.E.2d 188, 189 (1996) (citing *State v. Vause*, 328 N.C. 231, 236, 400 S.E.2d 57, 61 (1991)). A reviewing court must evaluate the evidence "in the light most favorable to the State, allowing every reasonable inference to be drawn therefrom." *State v. Davis*, 340 N.C. 1, 12, 455 S.E.2d 627, 632, *cert. denied*, 516 U.S. 846 (1995).

Here, it is beyond dispute that defendant carried property away, and that—assuming the property did not belong to him—he did so with the intent to permanently deprive the owner of the property, and without the owner's consent. Thus, the only issue in this case is whether defendant "took" the property of another when he withdrew and transferred money from his bank account.

To constitute a larceny, a taking must be wrongful. *See State v. Bowers*, 273 N.C. 652, 655, 161 S.E.2d 11, 14 (1968). In other words, the taking must be by an act of trespass. *See id.*; *State v. Webb*, 87 N.C. 558, 559 (1882). A larcenous trespass may be either actual or constructive. *Bowers*, 273 N.C. at 655, 161 S.E.2d at 14. A constructive trespass occurs "when possession of the property is fraudulently obtained by some trick or artifice." *Id.* (quoting *State v. Griffin*, 239 N.C. 41, 45, 79 S.E.2d 230, 232-33 (1953)). An actual trespass, on the other hand, occurs when the taking is without the consent of the owner. *See* 50 Am. Jur. 2d *Larceny* § 22 (2017); 3 Wayne R. LaFave, *Substantive Criminal Law* § 19.2(a), at 63 (2d ed. 2003) [hereinafter *Substantive Criminal Law*]; Rollin M. Perkins & Ronald N. Boyce, *Criminal Law* 303-04 (3d ed. 1982).

However the trespass occurs, it must be against the *possession* of another. *See Webb*, 87 N.C. at 559 (noting that a person with an interest in property may still be guilty of larceny if he "commit[s] a trespass upon the possession of" another); *Substantive Criminal Law* § 19.1(a), at 57 (noting that larceny is "a common-law crime . . . committed when one person misappropriate[s] another's property by means of taking it *from his possession* without his consent" (emphasis added)). Possession of property can also be actual or constructive, though the meaning of these terms differs from their meaning in the trespass context.[2] *See, e.g., State v. Weaver*, 359 N.C. 246, 259, 607 S.E.2d 599, 606-07 (2005). With respect to the crime of possession of a controlled substance, this Court has stated that "[a] person is in constructive possession of a thing when, while not having actual possession, he has the intent and capability to maintain control and dominion over that thing." *State v. Beaver*, 317 N.C. 643, 648, 346 S.E.2d 476, 480 (1986). The Court of Appeals has adopted this test for constructive possession in the context of other offenses as well, including larceny. *See, e.g., State v. McNair*, ___ N.C. App. ___, ___, ___ S.E.2d ___, ___, No. COA16-707, 2017 WL 1381591, at *6 (Apr. 18, 2017) (possession of burglary tools); *State v. Bailey*, 233 N.C. App. 688, 691, 757 S.E.2d 491, 493, *disc. rev. denied*, 367 N.C. 789, 766 S.E.2d 678 (2014) (possession of a firearm by a felon); *State v. Phillips*,

---

[2] In other words, while we have just discussed actual and constructive *trespass*, this issue—whether a person or entity has actual or constructive *possession*—is a wholly separate one.

172 N.C. App. 143, 146-47, 615 S.E.2d 880, 882-83 (2005) (possession of stolen property); *State v. Osborne*, 149 N.C. App. 235, 238-39, 562 S.E.2d 528, 531, *aff'd per curiam*, 356 N.C. 424, 571 S.E.2d 584 (2002) (larceny); *State v. Bonner*, 91 N.C. App. 424, 426, 371 S.E.2d 773, 775 (1988), *disc. rev. denied*, 323 N.C. 705, 377 S.E.2d 227 (1989) (embezzlement). We implicitly endorsed applying this test to the embezzlement context in *State v. Weaver*, *see* 359 N.C. at 259, 607 S.E.2d at 606-07, and we explicitly adopt it in the larceny context here.

To determine whether defendant took West's property by trespass, then, we must first determine whether West retained actual or constructive possession of the excess funds after they had been deposited in defendant's SECU account. Account holders generally do not have actual possession of funds in their bank accounts, and there is no indication in the record that West had actual possession of the funds here, even when they were still in its own account. *See Lipe v. Guilford Nat'l Bank*, 236 N.C. 328, 330-31, 72 S.E.2d 759, 761 (1952); Ann Graham, 1 Banking Law (Matthew Bender & Co., Inc.) § 9.05, at 9-14 (Feb. 2005) ("Absent some special arrangement between the parties, money deposited in a bank becomes the property of the bank and is available for use by the bank in its business."). Because there is no evidence that West had actual possession of the funds in its *own* bank account, West certainly did not retain actual possession of the funds that were transferred to *defendant's* bank account.

West did, however, retain constructive possession of the excess funds even after they had been transferred to defendant's account. From the time that defendant first knew about the excess funds transfer up until the time that defendant removed the funds from his account, West had the intent and capability to maintain control and dominion over the funds by effecting a reversal of the deposit. The fact that the reversal order was not successful—because defendant had removed the funds before the reversal could go through—does not indicate that West lacked constructive possession when the funds were in defendant's account. All it shows is that defendant's removal of the funds *deprived* West of constructive possession, which is consistent with *all* larcenies. After all, in every larceny, the possessor loses—for at least the briefest of moments, *see State v. Green*, 81 N.C. 560, 562 (1879)—the capability to control the property. As we have seen, that is what larceny is—a trespass against the rightful possessor's possession.

Having determined that the excess funds were in West's possession even after they were deposited into defendant's account, we must ascertain whether defendant simultaneously had possession of the funds once they were in his account. If he did, then he could not have committed larceny, because a defendant cannot commit larceny of goods that he already possesses. *See Substantive Criminal Law* § 19.2(a), at 62 ("If the wrongdoer fraudulently converts property already properly in his possession, he does not take it from anyone's possession and so cannot be guilty of larceny.").

We have not squarely addressed a situation like this one before, in which a defendant passively but knowingly received an overpayment by direct deposit and then proceeded to withdraw the excess funds against the wishes of the rightful possessor. But this case is akin to a case in which a person walks into a candy store and buys fifty cents' worth of candy. He hands the store owner a twenty dollar bill, only to be kicked out of the store, and the store owner pockets the bill. In that case, the store owner would be guilty of larceny because he did not have possession of the bill; the customer retained constructive possession of it, leaving the store owner with only custody of it. *See id.* §§ 19.1(a), at 59, 19.2(c), at 67. Similarly, here, because West retained constructive possession of the excess funds in defendant's account, and because defendant knew that West had the intent and capability to control the excess funds through a reversal of the deposit, defendant had no possessory interest in the funds. Like the store owner who accepts a bill that is worth more than he is owed without returning the change, defendant was simply the recipient of funds that he knew were supposed to be returned in large part. He therefore had mere custody of the funds, not possession of them.

When a person has mere custody of property, that person may be convicted of larceny when he appropriates the property to his own use with felonious intent. *See State v. Ruffin*, 164 N.C. 416, 417, 79 S.E. 417, 417 (1913). This is precisely because the property remains in the constructive possession of the rightful possessor, and the later appropriation interferes with that property right. *Id.*; *see also State v. Tilley*,

239 N.C. 245, 249, 79 S.E.2d 473, 476 (1954) (characterizing a warehouse custodian as having been "entrusted at most with the bare custody of the goods, whose possession in contemplation of law remained in the [owner] until [the defendant] feloniously took and carried them away"); *Substantive Criminal Law* § 19.1(a), at 58-59. The moment that the person in custody of the property wrongfully interferes with the rightful possessor's possessory interest is the moment that he takes that property.

So, because defendant lacked possession of the excess funds in his bank account, he "took" those funds when he removed them from his account through transfers and withdrawals. *Those* acts are what deprived West of constructive possession, by depriving West of its ability to effect a reversal of its excessive funds transfer. The State therefore presented sufficient evidence that defendant took West's property by an act of trespass when he removed the excess funds from his account.

Because we hold that the State presented sufficient evidence in support of defendant's larceny convictions, we reverse the decision of the Court of Appeals.

REVERSED.

Justice NEWBY concurring.

I concur fully with the majority opinion. I write separately to observe that this case presents an excellent example of the common law at work today, applying age-old tangible property principles to the modern, intangible electronic-banking context. As the Chief Justice well notes in his opinion, it is the knowing exercise of dominion and control over property to the exclusion of the true owner that "trespasses" on the owner's property rights and effectuates larceny. His candy store hypothetical is a good example. I write separately to amplify this point by taking this opportunity to answer the timeworn question arising from the iconic film *It's a Wonderful Life*: Was Old Man Potter simply morally corrupt or was he also guilty of a crime?

The role of the Court is not to devise the common law but to recognize and apply its lasting principles. *See Penny v. Little*, 4 Ill. (3 Scam.) 301, 304 (1841) (opinion of Stephen A. Douglas, father of Justice Robert M. Douglas of the North Carolina Supreme Court) ("The common law is a beautiful system; containing the wisdom and experience of ages . . . [and a]dapting itself to the condition and circumstances of the people . . . ."); *see also Reg. v. Ramsey* [1883] 48 L.T. 733 at 735 (Eng.) (Lord Coleridge CJ) ("[L]aw grows; and . . . though the principles of the law remain unchanged, . . . their application is to be changed with the changing circumstances of the times."); 1 William Blackstone, *Commentaries* *73 (The "chief corner stone of the laws . . . is general immemorial custom, or common law, from time to time declared in the decisions of the courts of justice: which decisions are preserved among our public records, explained in our reports, and digested for general use.")

11

North Carolina law has long recognized that when an individual finds property, and is unaware of its true owner, that individual has no legal duty to locate and return the property to the true owner. *See State v. Roper*, 14 N.C. (3 Dev.) 473, 474-75 (1832) (opinion of Daniel, J.) (A bona fide finder of lost or abandoned property, who later "appropriate[s the property] to his own use," is not guilty of larceny.); *see also State v. West*, 293 N.C. 18, 30, 235 S.E.2d 150, 157 (1977) ("[T]he owner of articles of personal property may terminate his ownership by abandoning it and, in that event, title passes to the first person who thereafter takes possession." (citation omitted)). Nonetheless, we applaud the high morals of one who does.

On the other hand, when an individual possesses property with the knowledge of its true owner, and exercises dominion and control over the property for his or her own purposes, thus trespassing on the true owner's property rights, that individual has committed larceny. *See State v. Farrow*, 61 N.C. (Phil.) 161, 163 (1867). It is not the unintentional receipt of the property that makes the act larceny, but the knowing exercise of control over it. *See id.*; *Roper*, 14 N.C. (3 Dev.) at 474-75; *see also State v. Arkle*, 116 N.C. 1017, 1031, 21 S.E. 408, 408 (1895) ("[T]here must be an original, felonious intent . . . at the time of the taking or finding of lost property . . . to constitute larceny.").

Here defendant knowingly exercised dominion and control over the mistakenly deposited funds to the exclusion of West. Evidence showed that West immediately put defendant on notice of the company's error and that defendant knew the money was West's as early as 12 July 2012, well before his ATM withdrawals and electronic

transfers on 15 July 2012. *See Roper*, 14 N.C. (3 Dev.) at 474-75. Logically, if West had lost or abandoned its ownership interest, West would not have immediately contacted defendant and his bank. Moreover, defendant could not have been mistaken about the money's ownership, given both West's notice to him and that his initial request was for only $1200. *See id.* at 475 ("If money, by mistake, is sent with a bureau to be repaired, and it is taken with felonious intent, it will be a larceny . . . ."); *see also* 50 Am. Jur. 2d *Larceny* § 32, at 42 (2006) ("Where money . . . is delivered by mistake, and the receiver takes it with knowledge of the mistake and with the intent to keep it, the offense is larceny, since there is no consent on the part of the owner to part with the excessive amount . . . ."). Thus, defendant committed larceny.

While the Chief Justice's opinion applies such long-standing common law principles to the modern banking context, the principles are equally applicable to situations arising in the past. Thus are we able to use them to answer the question, lingering in the minds of many, as to the criminal culpability of Old Man Potter. *See It's a Wonderful Life* (Liberty Films 1946).

In this beloved film, on Christmas Eve morning in 1945, Uncle Billy goes to Old Man Potter's bank to deposit $8000 in cash[3] for his family's benevolent business, the Bailey Brothers Building & Loan Company. While Uncle Billy is preparing his deposit slip in the bank lobby, Potter arrives with newspaper in hand. Uncle Billy

---

[3] $8000 adjusted for inflation would be approximately $107,483 today. *See* U.S. Dep't of Labor, Bureau of Labor Statistics, [*Consumer Price Index*] *Inflation Calculator* (2017).

turns to greet him and cannot help but good-naturedly needle crotchety Potter, who had greedily sought to quash the struggling Building & Loan Company for some time. Uncle Billy grabs the newspaper from Potter and proudly points to the picture of his nephew Harry on the front page—the war hero returning home. Potter angrily snatches the newspaper back, in which Uncle Billy had mistakenly folded the $8000 cash. At this point no crime has occurred; Uncle Billy has misplaced his money and Potter is unaware of his possession of it. *See Roper*, 14 N.C. (3 Dev.) at 475 (Though the defendant had possession of a lost shawl, he lacked felonious intent and was not guilty of larceny while simply returning it to the true owner.).

Back in his bank office, Potter unfolds the newspaper and discovers the money. Meanwhile, Uncle Billy attempts to make the deposit and, in horror, finds that he has misplaced the funds. Potter begins to return with the money to the lobby, but upon opening his office door he observes Uncle Billy searching frantically. Potter "puts two and two together," realizing the loss of funds will ruin George Bailey and his Building & Loan Company. Potter closes the door, keeping the $8000 cash. Armed with the knowledge that the money belongs to the Building & Loan Company, Potter exercises dominion and control by keeping the funds, and has thus committed larceny. *See id.* at 474-75.

That same day, the state bank examiner began auditing the Building & Loan Company, which now faced unavoidable collapse given the $8000 shortage. At his wits' end, George pleads with Potter for a loan to save the business. In response, Potter not only does not confess that he has the Building & Loan Company's money,

14

but instead brazenly inquires of George whether he had lost the money, possibly by "playing the markets" or through an extramarital affair. *See id.* at 474 (The finder's "subsequent appropriation in a secret manner, or *his denial of any knowledge of the goods*, or any other acts showing a felonious intent, would be evidence [supporting larceny]." (emphasis added) (citations omitted)). Ultimately, Potter phones the police to arrest George for "misappropriation" of company funds.

Facing certain tragedy, George attempts to take his own life. The attempt is cleverly thwarted by Clarence, an angel looking to earn his wings. Clarence helps George appreciate that, despite the current seemingly overwhelming challenges, life is worth living. George favors life over death. When he finally returns home to face whatever consequences may occur, George finds that the community has rallied around him, accumulating the necessary funds to save the Building & Loan Company and his reputation, just in time for Christmas.

So the story ends. George has a wonderful life. Clarence gets his wings. Old Man Potter is a morally bankrupt individual, but an unindicted felon. And we continue our quest to apply ageless common law principles to our ever-changing modern world.